

VOCATIONAL
ECONOMICS
INC.

NATIONAL HEADQUARTERS 800-227-0198

3200 WEST END AVENUE, SUITE 500, NASHVILLE, TN 37203  615-244-8480

WWW.VOCECON.COM

August 1, 2016

Mr. Loring E. Justice
Attorney at Law
Loring E. Justice, PLLC
11911 Kingston Pike, Ste. 201
Knoxville, TN 37922

RE: Craig Amos

Dear Mr. Justice:

The loss of earning capacity sustained by Craig Amos is in a range of $146,649 to $244,594 stated in terms of present value. Enclosed is our report on your client. The vocational economic assessment contains our conclusions regarding lost earnings as well as the relevant factors supporting those conclusions.

The vocational economic rationale presents both the philosophy and the methodology employed in assessing the loss. It is the standard employed by our firm in conducting a vocational economic assessment.

Please note that both undersigned experts should be named for testimony. Ms. Jones will testify as a vocational expert establishing Mr. Amos's before-termination and after-termination annual earning capacity and worklife. Dr. Missun will project the economic effect over Mr. Amos's worklife.

The projections in this report are based on information received to date and may be updated upon receipt of additional information and/or changes in Mr. Amos's condition.

Sincerely,
VOCATIONAL ECONOMICS, INC.

For the Firm

*Linda L. Jones*

Linda L. Jones, MRC, MBA, MPA, CRC

/llj

For the Firm

*Ronald E. Missun*

Ronald E. Missun, Ph.D.



VOCATIONAL
ECONOMICS
INC.

NATIONAL HEADQUARTERS 800-227-0198

3200 WEST END AVENUE, SUITE 500, NASHVILLE, TN 37203   615-244-8480                                   WWW.VOCECON.COM

# VOCATIONAL ECONOMIC ASSESSMENT
## FOR
## CRAIG AMOS

| | |
|---|---|
| **Date of Interview:** | June 28, 2016 |
| **Date of Report:** | August 1, 2016 |
| **Date of Birth:** | ███████ |
| **Age:** | 42 |
| **Educational Attainment:** | Completed eleventh grade and, subsequently, a high school equivalency diploma. Also achieved journeyman electrician, refrigeration and HVAC status. |
| **Work History:** | Maintenance technician; Electrician; Maintenance helper; Fast foods worker. |
| **Date of Injury:** | June 6, 2014 |
| **Information Reviewed:** | First and second amended complaints; Plaintiff's answers to interrogatories; Tennessee Department of Labor wage statement; Bodycote pay stubs; Carolina Heat pay stubs; Flowers Baking pay stubs; Social Security earnings statement; W2 Forms (2012-2014); Bodycote privilege logs and employment records; Records from Edward Workman, MD, FAAPM, ACFP; Records from Morristown Hamblen Hospital; Records from Outpatient Diagnostic Center of Knoxville; Records from Rural Metro Ambulance; Records from Tennessee Orthopedic Clinics; |

**Information Reviewed (cont'd.):**     Records from University of Tennessee
                                        Emergency Department;
                                        Records from Vanderbilt University Medical
                                        Center;
                                        Records from Stone River Pharmacy
                                        Services.

## Case Comments

Upon your request, Craig Amos's loss of capacity to perform work and earn money as a result of reported wrongful termination on June 6, 2014 was assessed. In conducting the assessment, Mr. Amos was interviewed on June 28, 2016 and informed consent was received. In addition, information forwarded by your office was reviewed.

The interview and the information reviewed reveal Mr. Amos to be an unemployed 42-year-old man who completed eleventh grade and, subsequently, a high school equivalency diploma. He also achieved journeyman electrician, refrigeration and HVAC status. Over his worklife, he functioned as a maintenance technician, electrician, maintenance helper and fast foods worker.

In June 2014, Mr. Amos was terminated by his employer, Bodycote.

In assessing loss of lifetime earnings, a variety of issues need to be considered. Assessment of lifetime earning capacity includes consideration of before-termination and after-termination annual earning capacity and before-termination and after-termination worklife expectancy. Once these are determined, present value is calculated. In considering the effects of Mr. Amos's disability on annual earning capacity and worklife expectancy, we used data from the US Census Bureau's American Community Survey (ACS) dealing with cognitive disability.

Mr. Amos meets the ACS definition of cognitive disability due to mental health diagnoses and associated symptoms following a burn accident in April 2014. Persons are defined as having a cognitive disability if they are identified as having serious difficulty concentrating, remembering, or making decisions because of a physical, mental, or emotional condition.

### Annual Earning Capacity

Mr. Amos's before-termination lifetime power to earn money is reasonably represented by the earnings that accrued to him as an employee of Bodycote in 2013, or $43,933 per annum, stated in terms of 2016 dollars.

Mr. Amos's after-termination annual earning capacity is presented in a range. His after-termination annual earnings capacity is reasonably represented by the range of earnings of an

average male with a GED or alternate credential with a nonsevere cognitive disability at the 25th percentile and median, or $20,700 to $33,120 per annum, stated in terms of 2016 dollars.

Male workers in the Knoxville, TN, metropolitan area with a GED or alternate earn 92% of the national median. National earnings figures were discounted by that rate to determine the after-termination earning capacities used in our assessment.

The earning capacities considered for Mr. Amos are as follows.

**Table 1 Earning Capacity**

|  | Before Termination | After Termination |
|---|---|---|
| Bodycote, 2013 | $43,933 | |
| 25th percentile to median, Male, GED/Alt. Credential, Cognitive disability | | $20,700 to $33,120 |

Before-termination fringe benefits are calculated based on Mr. Amos actual fringe benefits of family health coverage and employer match for 401K and Social Security, less Medicare, or 35.6%.[1] After-termination fringe benefits are calculated at the national average rate, less Medicare, of 26.2%.

**Worklife Expectancy**

Mr. Amos meets the ACS definition of cognitive disability due to mental health diagnoses and associated symptoms following a burn accident in April 2014. Therefore, his before- and after-termination worklife expectancy is like that of an average male with a GED or alternate credential with a cognitive disability.

The worklife expectancy that follows is for males beginning at age 42:

**Table 2 Worklife Expectancy**

| Education Level | Disability Status | Before Termination | After Termination |
|---|---|---|---|
| GED/Alternate Credential | Nonsevere cognitive disability | 6.2 yrs. | |

**Lifetime Loss**

The attached tables calculate Mr. Amos's loss of lifetime expected earnings. The present value figure assumes that future increases in real wage growth will be offset by the real rate of interest or discount over the remaining worklife expectancy. This assumption is supported

---

[1] See Attachment A Fringe Benefits Analysis/

by the long-term relationship between the rate of return on a conservative investment, such as a 91-day Treasury Bill, and the growth in labor market compensation.

The table below summarizes Mr. Amos's loss of earnings:

**Table 3 Loss of Earning Capacity**

| Basis for After-Termination Earning Capacity | Loss |
|---|---|
| Male, GED/Alt. Credential, Cognitive disability, Median | $146,649 |
| Male, GED/Alt. Credential, Cognitive disability, 25th Percentile | $244,594 |

The projections presented in this report are based on information received to date. Our analysis may be updated or changed upon receipt of new information and/or changes in Mr. Amos's condition.

# VOCATIONAL ECONOMIC RATIONALE

In cases of permanent disability or death, a lifetime loss of future earning capacity results. A Vocational Economic Assessment (VEA) defines the loss in terms of present value. This Vocational Economic Rationale (VER) presents both the philosophy and the methodology employed in these assessments. The method is used in cases of either partial or total disability. It is the standard employed by Vocational Economics, Inc., in conducting a VEA.

## Introduction

The U.S. Supreme Court's decisions in *Daubert* (1993) and *Kumho* (1999) require that expert testimony meet the general tests of "reliability" and "relevancy." The Court, however, has recognized the inexact nature of assessments for lost earnings. In *Jones and Laughlin Steel v. Pfeifer* (1983), the Court stated that:

> By its very nature the calculation of an award for lost earnings must be a rough approximation. Because the lost stream can never be predicted with complete confidence, any lump sum represents only a "rough and ready" effort to put the plaintiff in the position he would have been in had he not been injured.

Thirty years after the *Jones and Laughlin Steel v. Pfeifer* case, one might argue that improved Census Bureau data enable the expert to provide an empirically-based "rough and ready" effort to make the plaintiff economically whole. However, the expert opinion is still an estimate. It is not an absolute statement of what will occur for a plaintiff. No such opinion could ever be stated; rather, the expert defines what probability data tell us about persons most like the plaintiff, using both the best data available and clinical judgment. It is up to the trier of fact to make the ultimate decision as to what is most probable for the plaintiff in terms of future loss of earning capacity.

As an aid to the trier of fact, experts consider available statistics on disability when developing their opinions. The data from every macro survey conducted on the impact of disability on earnings and employment reach the same conclusions. Disability, regardless of how it is defined, reduces earnings for persons employed year-round, full-time. In addition, disability reduces employment across all levels of educational attainment. Employment levels serve as one of the primary building blocks of a worklife expectancy. Therefore, worklife expectancy is reduced. The best data available emanate from U.S. government surveys on disability.

A VEA is a forecast of future lost earnings based on diminished earning capacity. In conducting the assessment, vocational and economic experts consider the unique characteristics of the individual being assessed in combination with relevant career development and economic theory. Experts apply population statistics to individuals to predict a variety of future probable occurrences.

As noted by Marcia Angell in *Science on Trial* (1997 , 115):

> Courtroom trials are not about populations, they are about individuals. . . . We have
> no basis, at least in the current state of knowledge, for making a judgment about a
> particular woman. We therefore must appeal to epidemiological data – that is, studies
> of populations.

As stated by Gibson (2001, 21), "Statistical averages have long been accepted as a means for
prediction – life expectancy, earnings, and others – and have long been accepted for use in the
courts. No statistic, no matter how fine-tuned, can provide an exact predictor of an individual's
future." Nonetheless, utilizing statistical methodologies is a powerful method for arriving at a
more empirically-based opinion.

Earnings proxies and worklife expectancies are derived from average rates for various
populations. Experts use available statistics about populations and apply them to meet the
specifics of the case by considering how earnings or worklife expectancy statistics match the
plaintiff's circumstances and characteristics. Data are used by persons who understand the
principles on which they are based and the population to which they are applied.

The purpose of this VER is to define the principles underlying assessments of lost earnings as
well as the methodology employed in conducting a VEA. A previous edition of this VER has
been published in its entirety in the peer-reviewed journal *Estimating Earning Capacity: A
Journal of Debate and Discussion* (Gamboa, Tierney, et al. 2009).

# Disability Issues

The presence of a disability is widely known to affect both earnings and worklife expectancy.
This finding is documented in the results of every major survey that has attempted to study the
impact of disability, including:

- The Annual Social and Economic Supplement (ASEC, or the March Supplement) to the
  Current Population Survey (CPS), the Survey of Income and Program Participation
  (SIPP), and the American Community Survey (ACS) from the U.S. Census Bureau
  (2013);
- The monthly Current Population Survey from the U.S. Bureau of Labor Statistics and
  U.S. Census Bureau (U.S. Bureau of Labor Statistics 2015);
- The National Health Interview Survey (NHIS) from the National Center for Health
  Statistics (Harris, Hendershot and Stapleton October 2005);
- The *N.O.D./Harris Survey of Americans With Disabilities* (Harris Interactive 2000); and
- The Behavioral Risk Factor Surveillance System (BRFSS) conducted by the Centers for
  Disease Control and Prevention (Smith 2007)[1].

---

[1] In addition to the above U.S. surveys that consistently demonstrate reductions in earnings and worklife for the disability
population, Canada's Participation and Activity Limitation Survey (PALS) also identifies reductions. Crouse, Joseph T. 2015.
"Worklife Expectancies for Individuals with Disability: A Comparison Between the United States and Canada". *The
Rehabilitation Professional* 23(2): 93-100.

Revised 2/1/2016 © Copyright 2016 Vocational Economics, Inc. Vocational Economic Rationale

The importance of tracking the employment impact of disability is highlighted in the U.S. Census Bureau's website focusing on many of the above surveys (2013).

The disability effect is the cause of such events as the passage of the Americans with Disabilities Act (ADA),[2] the existence of the U.S. Department of Labor's Office of Disability Employment Policy,[3] and the development of the profession of rehabilitation counseling.

## Defining Disability

Before measuring the effect of disability on earnings and employment, it is necessary to define what is meant by disability. Depending on the desired focus, different groups and surveys will define disability differently. Brault (2012) notes that "no one survey estimate is 'right' or 'wrong' as all surveys must make choices about the type and nature of disability they intend to measure."

As noted in *Counting Working-Age People with Disabilities*, (Houtenville, Stapleton, et al. 2009, 28), "The Interagency Committee on Disability Research (ICDR) documents 67 acts or programs that define disability." The ADA, for instance, defines disability as existing in persons with a physical or mental impairment that substantially limits one or more of the major life activities. The Veterans Administration (VA) and the Social Security Administration (SSA) each have their own definitions, which vary considerably. Haber (December 1967, 17, 20) provides a general definition of disability:

> Literally interpreted, disability refers to "loss or reduction of ability." Definitions in use in clinical studies, survey research, and administrative evaluations commonly accept the loss or reduction of capacity to engage in normative role activities as the central point of reference of disability, with an origin in impairments or functional limitations resulting from disease or injury.

Haber goes on to note that:

> Disability is distinguished from functional limitations by its relationship to the required capacities for the performance of normal roles and activities. Disability represents a loss or decrease in ability to respond to behavioral expectations as a result of impairments and functional limitations.

Given this basic definition, there are various surveys that provide disability data that can be useful for a calculation of lifetime earnings.

## Impairment – Disability – Work Disability

It is important to differentiate between the terms impairment, disability, and work disability. The lack of understanding regarding the differences between these terms is responsible for some of the criticisms leveled at work disability data.

---

[2] http://www.ada.gov/
[3] http://www.dol.gov/odep

A physician typically defines impairment. Usually anatomical in nature, impairment may be defined as a percentage of physical functional impairment to the body as a whole. It establishes permanency, which is one value of an impairment rating in cases of personal injury. Typically, if there is no permanency of impairment, there is no future lifetime loss of earning capacity. Permanency of impairment may also be established by psychologists and neuropsychologists in cases involving traumatic brain injury (TBI), other acquired brain impairment, Post Traumatic Stress Disorder (PTSD), or severe psychological disturbances. Further, one must distinguish between impairment and restrictions. Physicians often identify permanent limitations (impairments) a patient might have without restricting their activities. It is the limitations that drive the assessment of a disability.

Disability is defined as existing when an individual is limited in terms of one or more activities of daily living, but not all impairments result in a disability. A one percent permanent partial impairment to the body as a whole as a result of an amputation of the ring finger of the non-dominant hand at the distal phalangeal joint would not likely result in either a disability or a work disability. Similarly, a disability resulting from impairment does not necessarily result in a work disability. A five percent permanent partial impairment to the body as a whole relating to injury and a subsequent back fusion may or may not result in a work disability even if it limits one or more activities of daily living such as yard care, home maintenance, jogging, golfing, or snow skiing.

If the individual with a back injury and fusion is a social worker or a rehabilitation counselor, it is possible that a work disability would not exist. However, if chronic pain exists and a future fusion or fusions are probable, it is likely that a decrease in both earnings and worklife expectancy would result. Chronic pain decreases the amount of work an individual is capable of performing, which results in a decreased level of productivity (Kapteyn, Smith and Van Soest March 2006). In addition, the aging process has been shown to exacerbate the impact of disability on earnings (Gamboa and Gibson 2008) and employment (Gamboa and Gibson, Gamboa Gibson Worklife Tables Revised 2015).

Work disability is defined by the U.S. Census Bureau (1983) as existing when a condition exists that limits the amount or kind of work an individual is capable of performing because of a physical or mental impairment. This definition is narrowly constructed.[4] It is not meant to define the prevalence of disability, but rather the earning and employment levels of those persons with a work disabling condition. Some argue that the data are too heterogeneous to be of value in that a wide range of physical maladies encompass the group.[5] However, the data are homogeneous and specific to those with a work disabling condition, the very type of individual seeking compensation for future economic loss as a result of a tort. The issue of work disability is supported in a report published by the Centers for Disease Control, based on information from the 2005 SIPP categorizing disability prevalence (2009).

U.S. government surveys have been used successfully in thousands of partial disability cases over the past thirty-five plus years. As documented throughout this rationale, the data are widely used by prominent disability researchers to measure the employment impact of disability.

---

[4] The Census Bureau later expanded this definition in the CPS, as explained later in this document.
[5] e.g., paraplegia, amputation, back sprains, knee injuries, back injuries, etc.

Revised 2/1/2016 © Copyright 2016Vocational Economics, Inc. Vocational Economic Rationale

Recognition of the use of government survey data continues to increase in numerous district court and appellate court decisions. The data serve as an excellent aid to the trier of fact in assessing economic loss in cases of partial disability.

## Disability Statistics

Many surveys demonstrate the effect of disability on earnings and employment. However, few offer a sample sufficiently large to quantify this impact by multiple levels of age, education, gender, and disability status. Two robust sources of data specific to both earnings and employment levels that also provide large sample sizes are the American Community Survey (ACS) and the Annual Social and Economic Supplement (ASEC) of the Current Population Survey (CPS), sometimes referred to as the March Supplement to the CPS. Both surveys allow classification of employment and earnings by age, gender, education, and disability versus non-disability status. The ASEC focuses on work disability, while the ACS examines earnings and employment from the functional perspective of mobility, cognitive, vision, hearing, and physical disability.

## American Community Survey

The U.S. Census Bureau's American Community Survey (ACS), the largest annual survey in the United States, is the only source of statistics on a wide range of important characteristics for all communities (Groves 2012). As such, the Census Bureau recognizes the ACS as the preferred source for examining small geographic areas and finely detailed categories (e.g. disability) on their website under *Guidance on Differences in Employment and Unemployment Estimates from Different Sources* (2013). The survey collects data from participants by asking a series of disability-related questions. The ACS has been conducted since 2000. Since 2005, its annual sample size[6] has been over 3 million persons per year, with annual response rates between 97 percent and 98 percent (Groves 2012).

In October of 2014, the U.S. Census Bureau published *American Community Survey: Handbook of Questions and Current Federal Uses* (October 2014). The publication provides examples of how the survey data collected is used. The disability questions are asked to understand the population with disabilities. Federal uses of the data include use by the U.S. Department of Commerce, in conjunction with the FCC, to determine whether residential households own computers and access the internet. The U.S. Department of Healh and Human Services uses the disability data collected by the ACS to determine current and projected health care services delivery needs, further noting that health status is related to employment status. In total, the report documents 75 applications of the disability questions within federal agencies alone, 11 of which focus specifically on the impact of disability on employment and earnings. (October 2014, 87-96)

Prior to 2008, the ACS defined disability based on the questions in Figure 1. A physical, cognitive, or sensory disability is considered severe when problems with self-care or going outside the home are also reported. Conversely, VEI analyses consider a nonsevere disability by

---

[6] The sample is 1% of the U.S. population annually, and is made available in the ACS Public Use Microdata Sample (PUMS).

Revised 2/1/2016 © *Copyright 2016Vocational Economics, Inc.* Vocational Economic Rationale

excluding the severe indicators and all of the other functional limitations.[7] Because work disability is measured with the Current Population Survey, the ACS work disability question is not used in VEI analyses.

**Figure 1 ACS Disability Criteria (prior to 2008)**

| Question | Classification |
|---|---|
| Does this person have any of the following long-lasting conditions: | |
| Blindness, deafness, or a severe vision or hearing impairment? | Sensory |
| A condition that substantially limits one or more basic physical activities such as walking, climbing stairs, reaching, lifting, or carrying? | Physical |
| Because of a physical, mental, or emotional condition lasting 6 months or more, does this person have any difficulty in doing any of the following activities: | |
| Learning, remembering, or concentrating? | Cognitive |
| Dressing, bathing, or getting around inside the home? | Self-Care |
| Going outside the home alone to shop or visit a doctor's office? | Go Outside Home |
| Working at a job or business? | Work |

The U.S. Census Bureau adopted a new set of six disability questions (Figure 2) beginning with the 2008 ACS. The physical disability question from the prior survey (see Figure 1), addressed functional limitations pertaining to both the upper and lower body. It was replaced with a question that addressed limitations in mobility (Figure 2).

The previous physical disability question was tested by both U.S. Bureau of Labor Statistics (BLS) and Census and found to be a reliable measure of disability (Brault, Stern and Raglin 2007) Employment rates generated from the physical disability question will continue to be a valuable source of data with which to calculate worklife expectancy for individuals with functional limitations of the upper body. Using the 2008 questions, a vision, cognitive, or mobility disability is considered severe when problems with self-care or going outside the home are also reported.

---

[7] For example, a nonsevere cognitive limitation excludes persons who report a yes response to any of the self-care, go outside the home, physical, or sensory questions.

Revised 2/1/2016 © Copyright 2016Vocational Economics, Inc. Vocational Economic Rationale

**Figure 2 ACS Disability Criteria (beginning 2008)**

| Question | Classification |
|---|---|
| Is this person deaf or does he/she have serious difficulty hearing? | Hearing |
| Is this person blind or does he/she have serious difficulty seeing even when wearing glasses? | Vision |
| Because of a physical, mental, or emotional condition, does this person have serious difficulty concentrating, remembering, or making decisions? | Cognitive |
| Does this person have serious difficulty walking or climbing stairs? | Mobility |
| Does this person have difficulty dressing or bathing? | Self-Care |
| Because of a physical, mental, or emotional condition, does this person have difficulty doing errands alone such as visiting a doctor's office or shopping? | Go Outside Home |

*Bureau of Labor Statistics Adoption in Monthly CPS*

The U.S. Bureau of Labor Statistics (BLS) adopted the disability questions in Figure 2 from the ACS as their official definition of disability and added them to the monthly CPS in public use data available beginning in 2009. The CPS is the primary source of data used to calculate monthly unemployment rates. This allowed the BLS to release "monthly labor force data from the CPS for persons with a disability." (U.S. Bureau of Labor Statistics 2015)

Calculation of employment rates yielded by the 2009 - 2012 CPS monthly surveys data reveal they are generally consistent with those generated from ACS data. As noted earlier, while the new CPS monthly survey data provide valuable information about the overall employment status of persons with a disability, the much larger sample size of the ACS makes it the preferred source of data for calculating worklife expectancy. The large sample size of the ACS allows for analysis by gender, age, level of education, and disability status.

## Work Disability

The CPS is the primary source of labor force characteristics for persons in the United States (U.S. Census Bureau 2012) and the source of the government's monthly unemployment rates that are widely quoted by the media. The CPS is used for a wide variety of purposes within the Federal government.

In March of every year since 1981, the CPS expands to collect more information on income and employment. The Annual Social and Economic Supplement (ASEC) to the CPS provides earnings and employment data through expanded questions that specifically address work disability. The U.S. Census Bureau began publishing data from the March Supplement in a

Revised 2/1/2016 © *Copyright 2016Vocational Economics, Inc.* Vocational Economic Rationale

publication entitled *Labor Force Status and Other Characteristics of Persons with a Work Disability: 1982* (1983).

The ASEC uses a definition that is specific to persons with a work disability. The survey does not consider specific types of impairment or disability, but instead focuses on whether the individual has work-related limitations because of a physical or mental impairment that limits the individual in terms of performing work (U.S. Census Bureau 2012).

Skoog and Toppino (1999) opine that the CPS March supplement, or ASEC, was never intended as a tool to measure the existence or impact of disability. This is correct. The ASEC measures work disability, which is different from disability. Hale (2001) suggests that the work disability data are unusable because the definition does not match disability as defined by the Americans with Disabilities Act (ADA). However, the ASEC data do not rely on the ADA definition, nor is that definition the best one to use when assessing earning capacity loss.

The U.S. Census Bureau defines work disability as existing when a person meets one or more of the following conditions:

### Figure 3 ASEC Work Disability Criteria

| | |
|---|---|
| **Not Severe** | Identified by the March supplement question "Does anyone in this household have a health problem or disability which prevents them from working or which limits the kind or amount of work they can do?" |
| | Identified by the March supplement question "Is there anyone in this household who ever retired or left a job for health reasons?" |
| | Received VA disability income in previous year |
| **Severe** | Identified by the core questionnaire as currently not in the labor force because of a disability that is expected to last for at least six months |
| | Identified by the March supplement as a person who did not work at all in the previous year because of illness or disability |
| | Under 65 years old and covered by Medicare in previous year |
| | Under 65 years old and received Supplemental Security Income (SSI) in previous year |

People who say yes to any of the Not Severe questions, but no to all of the Severe questions are classified as being not severely work disabled. Those who say yes to any of the Severe questions are classified as being severely work disabled.[8]

Experts who use the ASEC data specific to a work disabling condition must exercise clinical judgment in order to use the data effectively. In a forensic setting, a permanent physical or mental impairment that is medically or psychologically determined typically must be established in order to assign a reduction in worklife expectancy.

---

[8] BLS instituted new questions on disability in the monthly CPS beginning in 2009. The added questions are identical to those used in the American Community Survey beginning in 2008, and are discussed in the previous section focusing on the ACS.

It is important to note that two of the criteria for a severe work disability, "not in the labor force because of a disability that is expected to last for at least six months," and not working "at all in the previous year because of an illness or disability," would not automatically result in assigning a worklife expectancy equal to that of a severe work disability to a specific individual.

The forensic expert must determine whether or not an individual retains the ability to perform some type of substantial gainful work activity. If an individual is employed or clearly capable of employment based on the judgment of the expert, by definition that individual has a nonsevere work disability. This is true even if the individual has been unemployed for multiple years after the date of injury.

## Meeting *Daubert* and *Frye* Criteria

*Daubert* (1993), as expanded by the subsequent *Kumho* (1999) decision, requires that all expert testimony meet the general tests of "relevancy" and "reliability." Since use of disability statistics discussed in this rationale is for measurement of the impact of disability on lost future earnings, it is assumed that the relevancy criterion is met (Gibson 2001).

With regard to "reliability," the Court held that scientific evidence must be "grounded in the methods and procedures of science." *Daubert* provides four flexible factors to determine if the evidence qualifies: testing, peer review and publication, error rates and standards controlling the technique's operation, and general acceptance in the relevant community. As updated by *Kumho*, the court stressed that not all factors may apply with every case, especially in the social sciences. The factors serve as flexible guidelines to assure the expert employs the same level of intellectual rigor as he or she would outside the courtroom when working in the relevant discipline.

### Testing

The scientific testing criteria are principally directed at the "hard" sciences and engineering, and have less significance for vocational and economic testimony, which focuses on the future experience of people, which can never be tested or known with absolute certainty. However, data from the ACS and ASEC are produced and extensively tested by the U.S. Department of Commerce, Bureau of the Census. McNeil (n.d., 2) states that the ASEC disability questions are based on survey work carried out by the Social Security Administration (SSA) in the 1960s. The SSA was developing a method to identify "individuals with a condition that prevented them from working or a condition that substantially increased the risk that they would become unable to work." Further, McNeil comments that the work disability question from the ASEC has been asked since 1980, and that the ASEC is an important data source for analysts concerned with the disability worklife dynamic.

### Peer Review and Publication

Use of the underlying ACS and ASEC data to measure the impact of disability on earnings and employment is the subject of multiple published and peer reviewed articles. The U.S. Census Bureau recently partnered with the Population Reference Bureau (PRB) and Sabre Systems to

Revised 2/1/2016 © Copyright 2016 Vocational Economics, Inc. Vocational Economic Rationale

form a new American Community Survey Users Group. Its purpose is to improve the understanding of the value and utility of ACS Data and to promote information sharing among its users about key issues and applications. Presentations on VEI's use of the ACS data have been part of both of the initial ACS Data Users Conference Programs in 2014 (Gibson 2014) and 2015 (Gibson 2015), with the latter focusing specifically on use of disability data to quantify lifetime loss of earning capacity. A bibliography including over 100 publications using the ACS and/or ASEC data can be found at http://www.vocecon.com/resources/Bibliography/ACS Bibliography.pdf.

Both government and non-government researchers rely on the ASEC employment rates and earnings figures for nonforensic purposes. Senator Tom Harkin, chairman of the Committee on Health, Education, Labor & Pensions (HELP), introduced bipartisan legislation designed to help young people with disabilities transition successfully from school to higher education. His research and data came directly from the ACS disability data (2012). Burkhauser, Daly and Houtenville (2001) used data from the ASEC to compare the employment experience of people with and without work disability during the 1990s business cycle. This paper was published through the Disability Statistics Rehabilitation Research and Training Center (RRTC) for Economic Research on Employment Policy for Persons with Disabilities at Cornell University and Hunter College. The RRTC has published also several other papers using ASEC data on persons with a work disability.  These include a paper by Houtenville (2000) that studied the prevalence, employment rates, and household income of people with a work disability, as well as a paper by Burkhauser, Houtenville, and Wittenburg (2003) that compared the employment trends of persons with work limitations using the ASEC and two other government surveys.

The RRTC publishes an annual disability compendium of disability data from the ACS (Houtenville 2013). It also maintains a statistics "compendium" online, bringing together disability statistics compiled by various federal agencies. Among the information cited are the ACS and the monthly CPS.

The U. S. Bureau of Labor Statistics (BLS) adopted the impairment-based definitions in the ACS to use in the monthly Current Population Survey for purposes of tracking the employment outcomes of persons with disabilities (U. S. Bureau of Labor Statistics 2010). BLS uses these data to publish regular comparisons of the employment rates for persons with and without disabilities (Table A-6 2015). The U. S. Department of Labor's Office of Disability Employment policy also uses the data from the CPS as well as the much larger ACS to track and project the employment impact of disability (Disability Employment Statistics 2014).

Gamboa, et al. (2006), Gamboa (2008), and Crouse and Gamboa (2014) use data from the ACS to discuss the effects of mild traumatic brain injury on both earnings and employment. Gamboa (2006) used the same data to define key issues in assessing economic damages in cases of acquired brain injury. Gamboa and Gibson use both the ACS and ASEC for production of disability-specific worklife expectancy tables (Revised 2015).

Disabled veterans and individuals receiving Social Security Disability payments are among an expanding component of the current labor market. Researchers such as Tennant (2012) and Meyer and Mok (2013) use ACS data to measure the economic consequences of their disabilities. Another expanding component of the labor market includes Baby Boomers who are

Revised 2/1/2016 © Copyright 2016 Vocational Economics, Inc. Vocational Economic Rationale

entering the ranks of older age. ACS data was recently used to examine the combination of disability and older Americans. Researchers used five year estimates (2008-2012) to examine demographic and socioeconomic characteristics of the older population with disabilities in order to help anticipate future disability prevalence in the older population (He and Larsen 2014).

## Error Rate

The error rate is primarily intended to apply to the "hard" sciences and engineering in conjunction with the testing performed in those disciplines (e.g., reliability of a bolt securing a heavy sheet of metal). One can, however, compute the standard error of a worklife expectancy using the formula for the standard error of acceptance. The large sample sizes of the ACS and ASEC surveys assure low standard error rates. Sample size and its relationship to reliability are discussed further in the "Reliability" section below.

## General Acceptance in the Relevant Community

The *Daubert* test (as well as the *Frye* decision (1923) still used in many states) requires experts to apply generally accepted methodology. The general acceptance of combining vocational and economic disciplines for a thorough analysis of the impact of disability on employment and earnings was demonstrated by an article in *Forbes*. This article identifies the relationship between physical and/or cognitive injuries and negative impact on financial wherewithal as it relates to the NFL's settlement with impacted players and families (Rishe 2013).

Proof that the ACS and ASEC data meet the General Acceptance burden is offered through the multiple peer reviewed and other publications cited throughout this document. The "relevant community" is the community of rehabilitation researchers who rely on both ACS and ASEC data to determine both earning levels and employment levels for persons with a disability or a work disability. By way of example, Bjelland, Burkhauser, and Houtenville (2008) have regularly used information from the ACS and ASEC in assessing the impact of disability on employment. In addition, as previously mentioned, the Disability Statistics RRTC brings together disability statistics from a variety of federal agencies, including the ACS and the monthly CPS.

Researchers from the Institute for Homeland Security Solutions (IHSS) (Boos, et al. September 2009) used the data from the ACS to measure social vulnerability. The researchers recognize the usefulness of the ACS data in their application, as well as other applications including disability, health, ethnicity and age, and poverty. Their research brief specifically cites a previous article in Neurorehabilitation (Gamboa 2006), as well as other peer reviewed articles mentioned within this VER.

Perhaps the most thorough exploration of the impact of disability on employment, *Counting Working-Age People with Disabilities* (Houtenville, Stapleton, et al. 2009), uses data from both of these surveys, as well as the NHIS, SIPP, Canadian surveys, and others through a collection of articles authored by fifteen different disability researchers. Specifically for purposes of computing worklife expectancy, Richards and Donaldson (2010, 99) note in using the ACS and ASEC data that "it is demonstrably a fact that disabled persons as a whole have lower labor force

participation rates than those not disabled. By definition, worklife expectancies of those unable to participate in the labor force are reduced, either in full or in part."

## Validity

One issue is the question of the validity of ACS and ASEC data in estimating earnings and employment levels. Validity refers to whether or not the data collected measure what they are designed to measure, i.e., earnings and levels of employment. If we were talking about a test, then the question would be, "Does the instrument test what it is intended to test?" If we are talking about sampling, then the question would be, "Does the sample accurately reflect the population in question?"

There are different types of validity, but the over-arching type is construct validity. In a VEA, the constructs in question are the earnings and employment levels of the populations of persons without and with a disability. The question is, "Do the samples of data we have at hand (ACS and ASEC) accurately measure the earnings and employment levels of persons without and with a disability?"

In order to assess the accuracy of the data, we look at other types of validity: face validity and content validity. Face validity refers to the extent to which the sample looks like the population in question. Content validity in this context refers to the questions asked of the participants in the sample, namely their earnings and employment history.

The ACS and ASEC have both face validity and content validity in that the samples are taken from populations of individuals who are defined as nondisabled or disabled and these individuals are questioned about their employment and earnings. There is also convergent validity, in that the two data sets that purport to be assessing/measuring the same construct are in agreement to an acceptable degree.

Both the ACS and ASEC samples are in agreement in very important dimensions. Both sets of data show that earnings and employment levels for the nondisabled and disabled population are in the direction that is expected. Those with disability show lower earnings and lower levels of employment than nondisabled individuals. It can also be concluded that the ACS and ASEC data have concurrent validity, in that the data have the ability to distinguish between two groups that should theoretically be different, i.e. nondisabled vs. disabled.

One should note that validity is always a matter of degree and not a black or white issue. Validating a construct/theoretical relationship is always a matter of degree. For example, even before the ACS data were published, judgments and decisions were made based on ASEC data. The ACS data could be considered a further refinement and validation of the theoretical relationship between earnings, employment, and disability.

## Reliability

Another issue is the question of the reliability of ACS and ASEC data in estimating earnings and employment levels. Reliability refers to the consistency or the repeatability of a measurement operation. For example if we were measuring the intelligence of an individual, we would want to

obtain the same IQ score or nearly the same IQ score each time the individual was evaluated using the same test of intelligence. Likewise, if we take repeated samples of a defined population of people, we would hope to obtain similar scores for each sample. It is important to note that high reliability does not necessarily mean high validity. There can be high reliability, but no validity. For example, we might obtain highly reliable and consistent measures of swimming speed, but these data would not be valid with regard to the mathematic ability of the swimmers. Reliability is necessary, but it is not a sufficient condition for validity. Reliability refers to the precision of measurement of a sample; validity refers to the accuracy of the sample in representing the characteristics of the population.

In assessing reliability, the size of the sample is of critical importance. The larger the sample size is, the more inclusive and representative the sample becomes of the general population. Therefore, opinions and conclusions based on the data can be drawn with a higher degree of confidence that the results would match a census of the general population. Both the ACS and ASEC use very large samples. The sample size of the ASEC is more than 100,000 individuals annually. The ACS sample size is in excess of three million. Therefore, it would be expected (and is true) that the potential error would be extremely small for both sets of data, and the overall data sets would be expected to be highly reliable.

## Issues in Validity and Reliability

It must be stressed that by its very nature statistical data always have limitations. Many times, the limitations of statistical data can be improved by collecting still more data. For example, the methods by which individuals are classified as being disabled or nondisabled and degree or type of disability could be investigated from the standpoint of inter-rater reliability, which measures the consistency of the individuals doing the judging or categorizing of persons with a disability. Likewise, a longitudinal study following a group of individuals over a lifetime of work could provide a goldmine of useful data. However, the factors limiting such data-collection projects are always time and costs. It would take upwards of 40 years to complete the longitudinal study contemplated in this paragraph.

In the meantime, the ACS and ASEC data sets are the largest and best available for measuring earnings and employment levels for persons without and with a disability. A qualified expert must understand the nature of the data and exercise clinical judgment specific to the individual being evaluated. It is the combination of understanding the data and clinical judgment that can best aid the trier of fact.

It is generally accepted that rational decision-making requires the use of both probability statistics and professional judgment (Rubin 2003). While the U.S. Census data that emanate from both the ACS and ASEC provide an excellent data source for defining both earnings and employment levels for persons without and with various types of disability, applying the data to a specific individual requires a thorough understanding of the data in combination with an understanding of the unique traits and characteristics of the individual with a disability. Professional judgment by the forensic expert is necessary to determine from which population to draw the statistics to measure the expected earnings and employment rates of a given plaintiff.

# The Effect of Disability

Two facts exist for persons with a disability. The first is that on average, when such persons work year-round, full-time, they earn less than counterparts without a disability. Second, they experience lower levels of labor market participation and employment, which when considered in the aggregate, produce lower levels of worklife expectancy than those without a disability. These two facts combine to produce a probable reduction of lifetime expected earnings for persons with a disability.

These facts are supported by data from the ACS, the ASEC, and the SIPP that are available on the Census website (U.S. Census Bureau 2013), as well as the monthly CPS cited earlier. The findings using these and other data sources are confirmed in research conducted by numerous nonforensic researchers. For instance, McNeil (2000) used data from the March 2000 ASEC to explore employment rates of persons with a work disability. Also using ASEC data, Yelin (1996), Gibson (2001), and Gibson and Tierney (2000) have shown that employed persons with a work disability, both not severe and severe, are more likely to become unemployed than persons without a work disability. If unemployed, they are less likely to find employment. These differences become more profound with age, making it more difficult to compete with their counterparts without disability and further reducing worklife expectancy.

In work funded by the U.S. Department of Education, National Institute on Disability and Rehabilitation Research, researchers at Cornell and Hunter Universities published multiple papers that explore the reduction in earnings and employment for persons with a disability. Burkhauser, Daly, and Houtenville (2001) and Houtenville (2000) used data from the ASEC. Houtenville (2006), Weathers (2005), and Erickson and Lee (2008) used data from the ACS. Cornell's Employment and Disability Institute maintains online disability statistics using the most current versions of the ACS and ASEC (Disability Statistics 2014). The Rehabilitation Research and Training Center on Disability Statistics and Demographics maintains further data using both these surveys (Houtenville 2013).

Public health researchers have used data from the ACS to study the relationship of ethnic origin and poverty to disability (Fuller-Thomson and Minkler 2005) (Minkler, Fuller-Thomson and Guralnik 2006) (Fuller-Thomson and Gadalla 2008). Using ACS data, researchers from the Kessler Foundation identified individuals with disabilities that have achieved success in the workplace. Their efforts at identifying the disability employment gap can inform efforts to develop policies and practices that will narrow the persistent gap in employment between people with and without disabilities (Sevak, et al. 2015). The pay gap existing for persons with disabilities is also demonstrated by the American Institutes for Research, using ACS to demonstrate not only the pay gap, but also the increase in gross domestic product (GDP) that would be achieved if people with disabilities were paid comparably as those without (Yin, Shaewitz and Megra December 2014).

Other research includes a study by McCollister and Pflaum (n.d.) that uses the NHIS to study the effects of back pain on worklife expectancy and earnings, and another by DeLeire (2000) that uses the SIPP to address the continuing negative effects of disability following the passage of the Americans with Disabilities Act. Preceding the DeLeire article, a paper presented at the American Law and Economics annual meeting in 1996 cited the probable negative effect of the

Revised 2/1/2016 © *Copyright 2016Vocational Economics, Inc.* Vocational Economic Rationale

ADA on employment for persons with a work disability (Gamboa, Gibson and Tierney 1996). In fact, all known research on the subject shows that disability negatively impacts earnings and employment rates.

## Defining Earning Capacity

In order to perform a VEA, it is necessary to first understand the concept of earning capacity. Surprisingly little has been written in the forensic vocational or forensic economic literature on the topic of earning capacity. Horner and Slesnick (1999) discuss the concept and the need for a dialogue on the topic. In assessing earning capacity, they discuss the concepts of actual earnings, expected earnings, and earning capacity. These three concepts provide a framework for determining a loss of earning capacity in personal injury litigation. In response to their article, Tierney and Missun (2001, 3) define earning capacity from the perspective of a process model. They indicate, "It differs from traditional models by forsaking the essentialist categories of actual earnings, expected earnings, and earning capacity as commonly defined . . . It focuses on the process applied in assessing lost (future) earnings from which the earning capacity of a particular individual can emerge." Field (2008) provides a historical analysis of future earnings from the perspective of a five-fold venue, one of which is earning capacity.

Earning capacity is a term used by the courts to identify one component of monetary damages associated with a permanent impairment resulting in disability. Earning capacity differs from wage loss. Wage loss is retrospective, while earning capacity is prospective. Wage loss occurs when an employed individual is unable to continue employment in his or her occupation. It is typically a temporary condition.

An employed individual who sustains a back injury resulting in surgery will experience a period of recuperation during which time actual wages may not be realized. Upon returning to work, a future loss of earning capacity may or may not be probable. If the back injury is a result of a tort or wrong, the tortfeasor is responsible for compensating the individual for past wage loss. If a permanent impairment exists that limits the individual in terms of his or her ability to work, a future loss of earning capacity is probable.

Estimating earning capacity over a lifespan requires an analysis that is both vocational and economic in nature. The VEA is a five-step process. It requires a definition of each of the following: pre-injury earning capacity, pre-injury worklife expectancy, post-injury earning capacity, post-injury worklife expectancy, and a present value calculation.

The first decision point in a VEA requires the expert to define the base dollar figures that reasonably represent pre- and post-injury annual earning capacities. If the individual being assessed has a permanent, medically determinable cognitive or physical impairment, the expert considers the functional limitations associated with that impairment. If it is further determined that the person meets the definition of disability, other factors specific to the individual are then considered. These may include age, education, work history, earning history, general learning ability, transferable skills, present employment status, and labor market access.

Earning capacity represents an individual's ability or power to earn money. It is the sum total of what one brings to the marketplace intellectually and physically. Education, skills, general

Revised 2/1/2016 © Copyright 2016 Vocational Economics, Inc. Vocational Economic Rationale

learning ability, and the like comprise intellectual capacity. Ability to perform the physical activities associated with various jobs constitutes physical aptitude. These physical and intellectual attributes comprise human capital, and it is this human capital that enables a person to produce cash flows over a worklife.

Thus, if a person sustains a closed head injury that limits the ability to focus on a task, remember details, or relate to others, that person may sustain an impairment of mental ability. If, on the other hand, the person sustains a permanent injury limiting the ability to lift, climb, balance, stand, sit, etc., then physical ability is reduced. What remains to be determined in a case of permanent impairment is whether or not the injury in question has reduced or destroyed earning capacity. If so, that individual's earning capacity absent disability requires assessment and comparison with the earning capacity with disability.

## Human Capital

The legal system uses a variety of terms to identify probable future economic loss associated with a reduction in ability to work and earn money. Terms such as "reduced power to labor and earn money," "reduced ability to earn," "diminution of capacity to work and earn money," "destruction or reduction of power to work and earn money," and "reduced earning potential" are used to describe compensable damages associated with permanent impairment resulting in disability.

The courts generally acknowledge that something other than wage loss must be compensated for if the individual is likely to have a future earning reduction. If the courts ignored potential to earn and focused on wage loss alone, infants, children, or young adults with a nonexistent or limited earning history would be unable to recover monies likely to be lost as a result of a work disabling condition.

The language used by the court is synonymous with what economists call human capital. Capital is anything that produces wealth. It can be $100,000 invested in a certificate of deposit earning five percent per year or the same amount of money invested in ten, $10,000 lawn mowers. Each represents a form of capital, with the mowers requiring workers before a return on the investment is realized after expenses associated with labor and equipment are considered.

Human capital is defined by economists as the acquisition of knowledge, skill, and understanding as a result of education, training, and experience that allows an individual to sell his or her services in the marketplace in exchange for wages and fringe benefits.[9] The predictors of human capital are two-fold: intelligence and physical ability. These precursors were first introduced and defined by Gamboa in Thomson West (2006) and serve as the most fundamental building blocks of human capital. Each of the twelve-thousand plus occupational titles contained in the *Dictionary of Occupational Titles* (DOT) are identified as having one of five different levels of general learning ability or intelligence in order for the specific occupation to be performed satisfactorily by a worker (National Academy of Sciences, Committee on Occupational Classification and Analysis 1981). While these definitions are subjective estimates

---

[9] http://economics.about.com/cs/economicsglossary/g/human_capital.htm

made by employees of the U.S. Department of Labor, they serve as a superb estimate of probable level of intellectual capacity needed for the thousands of occupations identified in the DOT.

There is a strong positive correlation between the variables intelligence, education, skill level, and earnings. Herrnstein and Murray (1994) do an excellent job of examining the relationship among these variables and earnings. Similarly, Gladwell (2008) notes that the higher the IQ score, "the more education you'll get, and the more money you're likely to make, and – believe it or not – the longer you'll live." Gamboa and Gibson (2006) note that these same variables increase both earnings and worklife expectancy, and (Gibson 2015) quantifies lifetime earnings by education, age, gender, and disability status. The length of employment over the life expectancy adds significantly to lifetime earnings.

Intelligence and physical ability, the precursors to human capital, are used to define earning capacity loss in cases involving infants or children too young to be tested. Absent testing, parental level of educational attainment can be used as an estimate of the infant or child's capacity to complete formal education. There is a positive correlation between intelligence and level of educational attainment. Another approach involves IQ testing by a psychologist familiar with the statistical techniques used to account for regression toward the mean. By IQ testing of each biological parent, a specific IQ score can be used for an infant or child. However, either the education approach or the IQ testing approach is acceptable as an estimate of infant or child level of general learning ability.

Occupations require varying degrees of physical capability. Some occupations require physically strenuous activity while others require little to no physical exertion. The U.S. Department of Labor identifies a myriad of physical demands associated with the occupational titles contained in the DOT. Generally speaking, the occupations range from sedentary to very heavy and include a variety of exertional activities such as climbing, bending, reaching, prolonged standing, etc.

The development of human capital relies upon the two fundamental building blocks, intelligence and physical ability. Reduction or diminution of either of these two components of human capital is synonymous with a decrease in investment capital. A decrease in capital decreases the return on investment (ROI) whether it be human capital or investment capital. If the $100,000 CD is reduced to $20,000, the ROI at five percent is reduced to $1,000. If an individual, as a result of brain injury, sustains a diminution of cognitive functioning resulting in a decrease from significantly above average to average, a significant decrease in the human capital and ROI is realized. Similarly, data from the ACS reveal that college educated workers with physical limitations resulting in problems associated with lifting, carrying, climbing, etc. realize a significant reduction in earnings when compared to nondisabled counterparts who are without disability (U.S. Census Bureau 2015). Information from the National Longitudinal Transition Study-2 (NLTS-2) also confirms this impact for high school graduates (Newman, et al. 2011).

## Assessing Earning Capacity

In litigation, the issue is whether or not a permanent injury will affect an individual's ability to work and earn money over a lifetime. Earning capacity is the usual standard for defining lost earnings. Earning capacity is sometimes defined as the "high end" of what a person can earn, in terms of both the annual salary and the number of years worked over a lifetime. The courts,

however, usually do not accept damage arguments that would push the concept of earning capacity beyond the bounds of common sense. Our approach in assessing earning capacity is to look at the individual's reasonably expected earnings.

The process of analyzing a case involves answering a series of questions, with each question having several options. Through the process of answering these questions, an individual's earning capacity will emerge. In assessing an individual's annual earning capacity, the choices are to use either actual earnings or a proxy. In most instances, a mature worker has actual earnings that are congruent with future lifetime earning capacity. In cases where historical earnings are used to measure future earning capacity, an individual's historical earnings must be restated to present day dollars for proper comparison. Important sources of information are available from the U.S. Bureau of Labor Statistics:

- Consumer Price Index, All Urban Consumers (CPI-U) (2015)
- Major Sector Productivity and Costs Index: Business Sector, Hourly Compensation (2014)
- National Employment, Hours, and Earnings: Average Hourly Earnings of Production Workers (2015)

However, younger workers rarely have earnings that reasonably represent an average lifetime earning capacity. Vocational theorists note that individuals typically go through a series of stages before settling into a career. Young children and adolescents experience a fantasy stage (the young child desires to be a policeman, trapeze artist, etc.). In late adolescence and early adulthood, an individual experiences a period of exploration at which time a variety of career options are explored, assessed, and evaluated (college students changing majors exemplify the exploration process). As the worker matures, he or she tends to become established in a career. One then proceeds through a period of maintenance and, finally, decline (Ginzberg, et al. 1951) (Super 1957).

This vocational process of career development is conceptually related to the economic concept of the Age-Earnings Cycle. There is obviously a high correlation between age and earnings in that earnings tend to increase as the worker ages because experience enhances productivity, and more productive workers earn a premium in the labor market. It should be noted that the ability to be productive is based on the acquisitions of skill, the intellectual and physical aptitudes that one brings to the marketplace, and, of course, the level of educational attainment achieved by the worker. Gibson (2015) uses ACS to present age-specific earnings by gender, level of education, and disability status.

Proxy earnings may be specific to the worker's education level, occupation, or to the labor market, as well as to the worker's gender, disability, and/or age. Proxy earnings can be found in the Occupational Employment Statistics from the U.S. Bureau of Labor Statistics (2014). Data from the ACS (U.S. Census Bureau 2015) and ASEC (1998 forward) surveys can also be used to calculate average earnings of individuals by gender, level of educational attainment, and by disability status.

Beginning with the 2005 ACS, national average earnings can be calculated by occupational grouping, and state and local averages can be calculated by gender, education level, and

disability status. Further refined by the ACS, occupation earnings can be delineated by education. Gibson refined and updated the inaugural presentation given at the ACS Data Users Conference (2014) to demonstrate additional measures of earning capacity for individuals. The data demonstrates that expected earnings tend to increase with education even within specific occupations. This work was furthered in a paper delivered to the IARP Annual Conference (Use of ACS to Improve Occupation Earnings Estimates 2015).

Earning capacity is more commonly reduced, rather than destroyed, as a function of a disability. The post-injury earning capacity of a person with a disability is frequently represented by a proxy. The earning capacity associated with the proxy is often greater than the actual earnings of the individual with a disability. Many persons who are recently disabled have not yet begun employment or, if working, are earning at levels less than the amount that would reasonably represent their average lifetime earning capacity, stated in terms of present value.

Older workers with limited education who have performed heavy physical labor and who are disabled are more likely than younger workers to experience a complete destruction of earning capacity as a result of disability. A younger worker with a similar occupational history and a comparable disability would be relatively more likely to experience a reduction of lifetime earning capacity. Total destruction of earning capacity typically occurs among older workers who are no longer capable of performing their usual and customary work or those who are severely or catastrophically impaired, regardless of age.

Once the expert establishes annual earning capacity, appropriate fringe benefit and worklife expectancy values are applied to project lifetime earnings. Either actual fringe benefits or a statistical average is used. Statistical averages for fringe benefits may be derived from the U.S. Bureau of Labor Statistics' *Employer Costs for Employee Compensation* (2015). Another source for health care coverage emanates from the Kaiser Family Foundation's health insurance survey (2015).

# Worklife Expectancy

The second decision point in a VEA requires the expert to define pre- and post-injury worklife expectancies.

## Defining Worklife Expectancy

Worklife expectancy is a statistical average, derived by summing a series of joint probabilities of life, participation, and employment (LPE) from a given age through age 89.[10] The notion of worklife expectancy is not unique to the forensic setting, as evidenced by the various articles by Millimet et al., referencing ASEC data (Millimet, Nieswiadomy and Slottje 2010) (Millimet, Nieswiadomy and Ryu, et al. 2003). The worklife methodology used in VEAs was introduced as the LPE method by Brookshire and Cobb (1983) and refined by Brookshire, Cobb, and Gamboa (1987) to include persons with a work disability. With this methodology, a person's earning capacity is reduced by the probability of being alive and employed.

---

[10]An explanation for the LPE methodology is provided on the Vocational Economics website (http://www.vocecon.com/resources/ftp/data/lpecalc.pdf).

Revised 2/1/2016 © *Copyright 2016 Vocational Economics, Inc.* Vocational Economic Rationale

This methodology can be applied using data from various surveys in order to calculate disability-related worklife expectancy. Using ASEC data, worklife expectancy tables for persons with a work disability were first published by Gamboa (1987) and updated periodically. The latest edition includes worklife expectancy statistics for persons with a work disability as well as for those with a physical or cognitive disability (Gamboa and Gibson Revised 2015).

The notion of discounting an individual's future earning capacity by the probability of being alive and employed first appeared in an appellate court decision entitled O'Shea v. Riverway Towing (1982, 1194) written by Richard A. Posner. In commenting on the plaintiff's before injury expected earnings, he notes:

> If the probability of her being employed as a boat's cook full time in 1990 was only 75 percent, for example, then her estimated wages in that year should have been multiplied by .75 to determine the value of the expectation that she lost as a result of the accident; and so with each of the other future years.

In terms of assessing after injury expected earnings, he describes the following:

> Here is a middle-aged woman, very overweight, badly scarred on one arm and one leg, unsteady on her feet, in constant and serious pain from the accident, with no education beyond high school and no work skills other than cooking, a job that happens to require standing for long periods which she is incapable of doing. It seems unlikely that someone in this condition could find gainful work at the minimum wage. True, the probability is not zero; and a better procedure, therefore, might have been to subtract from Mrs. O'Shea's lost future wages as a boat's cook the wages in some other job, discounted (i.e., multiplied) by the probability-very low-that she would in fact be able to get another job. But the district judge cannot be criticized for having failed to use a procedure not suggested by either party. The question put to him was the dichotomous one, would she or would she not get another job if she made reasonable efforts to do so? This required him to decide whether there was a more than 50 percent probability that she would. We cannot say that the negative answer he gave to that question was clearly erroneous.

The opinion reflects a "better procedure" for estimating future expected earnings – that of utilizing probability statistics to better define future expected earnings in assisting the trier of fact. The O'Shea case involves a woman with a severe work disability. The probability of employment for a 57-year-old female high school graduate with a severe work or physical disability is .044 or .116, respectively, compared to a probability of employment of .654 or .673 for a female of the same age and education with no disability (Gamboa and Gibson Revised 2015).

## Assessing Worklife Expectancy

Because worklife expectancy is a statistical average, exercising professional judgment is essential when defining probable worklife expectancy in years. Worklife expectancy is specific to gender, career pattern, education, age, and disability.

Revised 2/1/2016 © Copyright 2016 Vocational Economics, Inc. Vocational Economic Rationale

When assessing worklife expectancy, it is important to consider the individual's work history. Typically, males have worklife expectancies that are greater than females. However, a specific female may demonstrate a work pattern that is more like that of an average male of the same age and level of education than that of a female. Similarly, some males may exhibit a pattern of work that is unlike that of an average male with a similar age, education level, and disability status. The specifics of each individual must be considered when assigning worklife expectancy.

Defining worklife expectancy for an individual also requires examination of personal and economic incentives of work. Individuals who are members of labor unions, for example, may have economic incentives in the form of pension receipts to maintain work until a specific age. Older workers with younger children may have economic incentive to maintain employment and support further educational attainment. Individuals with demonstrated employment higher than their statistical cohort may be expected to continue. Using rates of continuous employment may be appropriate in all or any of the above examples.

The disabled population varies significantly in terms of severity of disability, which in turn influences access to various occupations in the labor market. This variance is taken into account with worklife expectancy averages for persons with disabilities. When using data specific to people with work disabilities, for instance, these averages are of three types: the average for all persons with work disabilities, the average for persons with severe work disabilities, and the average for persons whose work disabilities are not severe. Individuals who meet the definition of work disability and who are employed or who have access to a significant portion of jobs in the labor market may be considered not severely disabled. Individuals who are highly unlikely to find or maintain employment are likely to be totally disabled or to meet the definition of severe work disability.

With data from the American Community Survey, averages can be looked at by type of disability, such as physical or cognitive, which would be appropriate for those persons meeting the definitions noted previously. Through isolation or combination of these varying disability types, an analysis can be customized to meet the specifics of a particular case.

Employment statistics offer average for groups of individuals. Just as a nondisabled worker may have employment experiences that exceed the average for their statistical cohort, a person meeting the definition of disability may have employment experiences that exceed the average. An expert may choose to identify the individual as having a higher (or lower) than average level of expected employment probabilities through the use of a continuum placement.

The ACS defines disability from both a physical and cognitive perspective. In addition, it identifies persons with problems associated with self-care and/or going outside of the home alone. When either of these two additional limitations exist, a severe physical or cognitive disability is likely to exist.

## Present Value of Future Lost Earnings

The last decision point in a VEA is the statement of future loss of earnings in terms of present value. Present value in a litigation context specific to loss of earning capacity refers to the amount of money needed today which, when prudently invested, will replace a future stream of

lost earnings. The present value sum plus accumulated interest should provide periodic cash payments to replace the expected lost earnings over the plaintiff's worklife expectancy, with no shortfall or overage.

The calculation of present value considers two facts. The first fact is earnings tend to increase over time. For example, the average teacher in 2016 is likely to earn less than the average teacher in 2026. As a result, present value of future lost earnings must consider the fact that earnings are likely to increase over the time period that losses are projected. The annual rate of increase is often referred to as the growth rate.

The second fact concerns a financial consideration. If an amount of money is invested today for future lost earnings, interest can be earned from investing this money before the loss occurs. For instance, money in-hand today to compensate for loss of earnings as a teacher in 2026 should also consider interest that can be earned from investing this money until 2026. The interest rate used to reduce loss of future value earnings to present value is often referred to as the discount rate.

Growth and discount rates can either be stated as "nominal" or "real" rates. Nominal rates include inflation while real rates are net of inflation. For example, suppose in a particular year the general rate of inflation as measured by the Consumer Price Index (CPI) is 3%, and an investment yields a 5% rate of interest. The nominal rate of interest is 5%. However, there would only be a 2% gain in terms of the real purchasing power of the money earned because inflation has also risen at 3%. The real rate of interest in this example would be 2%. Likewise, a person with a 5% increase in earnings in a year when the general rate of inflation was 3% would have a 5% nominal and 2% real growth in earnings. Present value calculations can either be performed with real or nominal rates. Both approaches are acceptable for computing the present value of a future stream of lost earnings.

## Growth Rate for Compensation

Before selecting a growth rate, one must consider precisely what is being grown. There are a number of fairly common misunderstandings in this regard that deserve mention. For example, some attorneys refer to the growth rate as "inflation." The word inflation in the field of economics typically refers to an increase in consumer prices, as measured by the CPI. The rate of increase in the CPI may not be the same as the rate of growth in earnings since consumer prices and a worker's earnings are different variables.

Another common misunderstanding is the belief that the growth rate is the rate of increase in wages. Since a "lost earnings" analysis considers both base wage and fringe benefits, the growth rate should consider both components. Fringe benefits such as health coverage and retirement have an economic value, which is part of what a person earns in exchange for their employment. A person may have an economic incentive to accept a lower paying job because it offers better benefits. In other instances, a person may have an economic incentive to accept a job with no benefits, other than those that are legally mandated, if they are compensated with relatively high wages. For these reasons, total compensation (wages plus benefits) is generally the appropriate variable to examine when discussing what is often referred to as growth in earnings.

Revised 2/1/2016 © *Copyright 2016Vocational Economics, Inc.* Vocational Economic Rationale

Figure 4 on shows historical rates of growth for inflation, wages, and total compensation, all from the U.S. Bureau of Labor Statistics. The data summarized in Figure 4 show that the rate of growth in total compensation has consistently outpaced both inflation and wage growth for short-term as well as long-term time periods. Thus, any analysis of lost earnings conducted during those periods that used a growth rate measured by wages only, would have underestimated the actual growth.

Having decided to examine compensation data, instead of inflation or wage data, the next step towards choosing a growth rate is a selection of historical time period(s) that should be considered for the assessment. Averages for different time periods will obviously result in different average nominal and real rates of growth for compensation.

Future projections are made with uncertainty to the future state of the economy. For example, no one could say with great certainty whether or not inflation will be relatively high or low ten years from now, whether or not our economy will be in a recession at that time, etc. For these reasons, a reasonable and fair estimate of the future rate of growth in total compensation should generally be based on long-term data for average growth in total compensation. Long-term averages cover many years, including years of recession and strong economic growth as well as years with high and low levels of inflation. The same time periods examined for compensation growth should be reviewed for interest rates used to discount an award to present value, as discussed in the following section. Therefore, the selection of historical time period(s) to consider for future compensation growth must also be appropriate for choosing a fair and reasonable discount rate.

## Interest or Discount Rate

The next step in computing present value is to reduce the future cash flow values for interest the plaintiff can earn by investing a lump-sum award. That is, we must reduce the future value of projected cash flows for the interest the plaintiff can earn since the damages award is in advance of the anticipated occurrence. Choice of the rate used to measure interest is critical since the higher the assumed interest rate, the larger the reduction and the lower the needed lump-sum award.

Finance theory refers to this process as *discounting* and the rate applied as the *discount rate*. Further, such theory recognizes that discount rates are comprised of expected inflation, a real rate of return, and a risk premium. Whether valuing business income, a potential investment, or future wages, theory requires that the rate used reflect the overall riskiness of the measured cash flow. Valuation of lost future compensation is not measurement of a speculative investment, but the replacement of the bread and butter the plaintiff is putting on the family table. As such, the risk premium component should be valued at zero.

This is similar to the approach proposed by Brody over thirty years ago (Brody 1982). Further, this approach is consistent with that prescribed by the U.S. Supreme Court (Jones and Laughlin Steel Corporation v. Howard E. Pfeifer 1983), in which they dictate use of the "best and safest investments" and a "risk-free stream of earnings."

With the intent of applying a risk-free discount rate, we must determine the best instrument to measure this rate. Risk of debtor default brings increases in interest rates to compensate the

creditor for the risk assumed. Thus, the instrument used should bear no such risk. Experts agree that the closest instruments to being free of such risk are the bonds and bills issued by the United States Treasury. However, our search for a risk-free rate does not stop with identification of the issuer of the instrument. The Treasury offers many forms and durations of debt instruments. Consider two extremes presented in Figure 4 debt instruments with 91-day and 10-year maturities. As shown, longer-term commitments regularly command higher interest rates, despite the fact that both bear the same risk of default, considered to be zero. Investors command a premium to compensate for the long-term commitment and the inherent risks associated with it, including the risk of inflation.

### Figure 4 Key Growth and Interest Rates[11]

| Period | Inflation | Wage Growth | Compen. Growth | 91-Day | 10-Year[12] |
|---|---|---|---|---|---|
| 60 years (1955-2015) | 3.7% | 4.2% | 5.1% | 4.7% | N/A |
| 50 years (1965-2015) | 4.1% | 4.3% | 5.2% | 5.1% | 6.5% |
| 40 years (1975-2015) | 3.8% | 3.8% | 4.6% | 4.9% | 6.6% |
| 30 years (1985-2015) | 2.7% | 3.0% | 3.7% | 3.5% | 5.3% |
| 20 years (1995-2015) | 2.3% | 3.1% | 3.5% | 2.4% | 4.1% |
| 10 years (2005-2015) | 2.0% | 2.8% | 2.6% | 1.1% | 3.1% |
| 5 years (2010-2015) | 1.8% | 2.2% | 2.5% | 0.0% | 2.3% |

The risk of inflation arises because interest rates and note values change with inflation. As shown in Figure 4, interest rates rise and fall with inflation. If an investor buys a 10-year note in a period of low inflation, a rise in inflation will decrease the value of the investment and the real rate of return. As noted by Pelaez (1995, 54), discounting lost earnings by a long-term rate is asking the plaintiff "to accept risk in order to reduce the tortfeasor's liability."

In addition, multi-year Treasury instruments can carry a tax disadvantage for the buyer. Some Treasury instruments pay no interest until maturity. However, an imputed annual interest amount[13] is required to be realized as taxable income, resulting in annual tax payments before receipt of any cash flow from the investment. Standard long-term Treasury notes do pay interest every six months. However, even these may have a hidden tax disadvantage, since adjustment of a bond's face rate to the rate commanded by financial markets is achieved by paying more or less than the face value of the bond or through an "Original Issue Discount." This difference is also amortized over the life of the bond and realized as an adjustment to interest earned. Thus, in

---

[11] Rates shown are the geometric averages for the identified periods of time using data from the following sources:
- U.S. Bureau of Labor Statistics - Inflation (Consumer Price Index, All Urban Consumers (CPI-U), U.S. City Average 2015), Wage Growth (National Employment, Hours, and Earnings: Average Hourly Earnings of Production Workers 2015), and Compensation Growth (Major Sector Productivity and Costs Index: Business Sector, Hourly Compensation 2014)
- Federal Reserve Bank – 91-day Treasury Bill (3-Month Treasury Bill Secondary Market Rate Discount Basis 2015) and 10-year Treasury Note (Market Yield on US Treasury Securities at 10-year Constant Maturity Quoted on Investment Basis 2015).

[12] 10-year Treasury Bonds did not exist until 1962.

[13] This imputed interest is known as *accretion*.

Revised 2/1/2016 © *Copyright 2016Vocational Economics, Inc.* Vocational Economic Rationale

cases where the market rate exceeds the face rate, the buyer will pay less than the face value of the bond and pay taxes on the annual amortization even though the actual cash will not be received until the bond's maturity.

As a preferred alternative, short-term rates such as the 91-day Treasury Bill[14] provide the same protection against the risk of default. Moreover, they provide the added protection against inflation risk by cycling maturities to meet needed cash flows and avoid the tax disadvantages of long-term bonds. Choice of a 91-day Treasury as a measure of the risk-free discount rate is supported in financial literature and in forensic economic articles such as Pelaez (1989), Lawlis and Male (1994), and Altmann (2002).

Some alternatives occasionally proposed by other experts include the following:

- **Long-term Treasury Notes or Bonds** – As discussed above, these instruments all provide greater risk from inflation and may present tax disadvantages.
- **Treasury Inflation-Protected Securities (TIPS)** – Issued by the United States Treasury, TIPS bonds have an appeal of offering an instrument with no risk of default that is also protected against inflation. However, the market for these relatively new instruments is still imperfect as noted in many articles including Shen and Corning (2001) and Kopcke and Kimball (1999). This has even resulted in negative inflation-adjusted yields (Gongloff 2008).
- **Municipal Bonds** – High-grade debt instruments may provide less risk than the corporate bond market. However, as demonstrated in past financial crises and likely in the current economic environment, they are far from the level of protection offered by U.S. Treasury instruments.
- **Stock Market** – Although some may proffer discount rates derived from general stock market returns, in no event can these be considered to meet the requirements of risk-free rates, regardless of the stature of the companies included. This is certainly demonstrated by the market performance in the economic crisis that began in 2008.

Thus, in our opinion, at the time of this writing, the nature of claims and known court guidelines mandate use of a risk-free discount rate when valuing lost earnings. The best measure of this rate is offered by a 91-day Treasury bill.

## Present Value Calculation

There are two important variables to be considered in arriving at the present value of a future loss of earning capacity. The first is the growth factor to be used. The second is the discount factor. If the growth factor is greater than the discount factor, a net negative discount results. If a pure offset, also referred to as a net neutral discount, is used to arrive at present value, the growth factor is equal to the discount factor, resulting in a present value sum less than the value achieved if a net negative discount is used. A third approach to arriving at present value is referred to as a

---

[14] We note that the U.S. Treasury also offers instruments of even shorter duration: 4-week Treasury Bills. These instruments have only been available since 2001, so they do not have a long-term measurable trend. However, in their tenure, they generally have a rate of return comparable to 91-day Treasury Bills.

Revised 2/1/2016 © *Copyright 2016Vocational Economics, Inc.* Vocational Economic Rationale

net positive discount. The discount factor is assumed to be greater than the growth factor, resulting in a present value sum less than the value achieved if a net neutral discount is used.

The standard methodology employed in arriving at a present value calculation embraces the following formula:

$$PV = \sum CF \left(\frac{1+G}{1+D}\right)^n$$

PV = Present Value
$\sum$ CF = Summation of the cash flows
G = Growth rate for compensation
D = Discount rate of interest rate
$n$ = years of compounding and discounting

All present value calculations utilize the same methodology. Different present value sums are derived as a function of the growth and discount factor used. When a pure offset is used, the growth and discount factors are set as equal to one another. The effect neutralizes the future cash flows resulting in a net neutral discount. Therefore, the summation of each of the future cash flows stated in terms of today's dollars becomes the present value.

Economic literature provides substantial support for a total offset to value lost earnings. Altmann (2002) reviews historical cycles and notes that any disturbance between equilibrium of growth and discount rates tends to be temporary due to "powerful economic forces" that cause the net discount rate to regress to 0%. Lawlis and Male (1994) found a random walk relationship between growth and interest and held that a total offset is the least potentially biased net discount rate.

Brody (1982) observed that with risk held to 0%, the only factors to consider are productivity gains (growth) and the real interest rate. He held that a total offset had been the most accurate net discount rate in the preceding twenty years.

Carlson (1976) noted that when inflation is fully anticipated by the financial and labor markets, wage increases and bond yields were essentially equal. He held that use of a total offset was not only accurate but eliminated much of the confusion generated in courtrooms debating the appropriate rates, classifying such debate as "just plain silly and unnecessary."

Pelaez (1989) found a total offset to be a "robust alternative to the pursuit of illusory exactness based on time consuming calculations and dubious prognostications." In a subsequent article, Pelaez (1995) affirmed the total offset's superiority when considering real interest and growth rates.

Schwartz and Thornton (1991) affirmed much of the above observations. Schwartz (1997) updated his opinions, noting the fallacy of trying to measure movements of earnings and interest rates on short-term trends. He held "over the longer run, the relation between the basic real

interest rate and the productivity growth rate does seem to approach equality." Schwartz (2000) affirmed his findings yet again a few years later, noting that use of a total offset is not only fair, but efficient because of its ability to reduce many complications and costs of litigation.

More recently, Stern (2005) confronted the myths associated with "discounting to present value." He provides examples of why it is not necessary to reduce a future earnings loss below the value of today's dollars.

# Summary

The attached VEA conforms to the principles identified in this VER. The lifetime loss of earning capacity is derived through a five-step model involving a definition of pre-injury earning capacity, pre-injury worklife expectancy, post-injury earning capacity, post-injury worklife expectancy, and a present value calculation. Each step in the assessment pertaining to lifetime earning potential is geared to the unique traits and characteristics of the individual. The present value of the lost earnings is an estimate of the measurable economic damages sustained by the individual.

# Bibliography

Altmann, James L. "Extreme Volatility in Interest Rates and Earnings Growth Rates: The Bane of Forensic Economists." *Journal of Business Disciplines* III, no. 1 (2002): 31-41.

Angell, Marcia. *Science on Trial: The Clash of Medical Evidence and the Law in the Breast Implant Case.* New York, NY: W.W. Norton & Company, 1997 .

Bjelland, Melissa J., Richard V. Burkhauser, and Andrew J. Houtenville. *2008 Progress Report on the Economic Well-Being of Working Age People with Disabilities.* Electronic Version, Ithaca, NY: Rehabilitation Research and Training Center for Economic Research on Employment Policy for Persons with Disabilities, 2008.

Boos, John, Gale Boyd, Lee Rivers Mobley, and William Wheaton. *The American Community Survey and Enhanced Community-Level Social Vulnerability Assessment.* Research Brief, Institute for Homeland Security Solutions, September 2009.

Brault, Matthew. *Disability Blog - Counting People with Disabilities.* July 2012. http://usodep.blogs.govdelivery.com/2012/07/30/counting-people-with-disabilities/ (accessed May 2013).

Brault, Matthew, Sharon Stern, and David Raglin. *Evaluation Report Covering Disability.* U.S. Census Bureau, 2007.

Brody, Michael T. "Inflation, Productivity, and the Total Offset Method of Calculating Damages for Lost Future Earnings." *The University of Chicago Law Review*, 1982: 1003-1025.

Brookshire, Michael L., and William E. Cobb. "The Life-Participation-Employment Approach to Worklife Expectancy in Personal Injury and Wrongful Death Cases." *For the Defense*, 1983: 20-25.

Brookshire, Michael L., William E. Cobb, and Anthony M. Jr. Gamboa. "Work-Life of the Partially Disabled." *Trial*, 1987.

Burkhauser, Richard V., Andrew J. Houtenville, and David C. Wittenburg. "A User Guide to Current Statistics on the Employment of People with Disabilities." Edited by D.C. Stapleton and R.V.Burkhauser, 23-86. Kalamazoo, MI: W.E.Upjohn Institute for Employment Research, 2003.

Burkhauser, Richard V., Mary C. Daly, and Andrew J. Houtenville. "How Working Age People With Disabilities Fared Over the 1990s Business Cycle." In *Ensuring Health and Income: Security for an Aging Workforce*, edited by Peter P Budetti, Richard V Burkhauser, Janice M Gregory and H. Allen Hunt, 291-346. Kalamazoo, Michigan: W.E. Upjohn Institute for Employment Research, 2001.

Revised 2/1/2016 © *Copyright 2016Vocational Economics, Inc.* Vocational Economic Rationale

*CRAIG AMOS, August 1, 2016*  Case 2:15-cv-00185-JRG-MCLC   Document 105-2   Filed 02/18/17   Page 33 of 68   PageID #: 1388  *Page 33 of 47*

Carlson, John A. "Economic Analysis v. Courtroom Controversy: The Present Value of Future Earnings." *American Bar Association Journal*, 1976: 628-631.

Centers for Disease Control. "Prevalence and Most Common Causes of Disability Among Adults, United States, 2005." *Morbidity and Mortality Weekly Report (MMWR)*, May 1, 2009: 421-426.

Cornell University. *Disability Statistics*. 2014. http://www.disabilitystatistics.org/ (accessed December 2015).

Crouse, Joseph T, and Anthony M Jr Gamboa. "The Economics of Traumatic Brain Injury Disability." *Brain Injury Professional* 11, no. 3 (2014): 20-22.

*Daubert v. Merrell Dow Pharmaceuticals, Inc.* 113 S. Ct. 2876 (509 U.S. 579, 1993).

DeLeire, Thomas. "The Wage and Employment Effects of the Americans with Disabilities Act." *Journal of Human Resources* 35, no. 4 (2000): 693-715.

Erickson, William A., and Camille G. Lee. *2007 Disability Status Report: United States*. Ithaca, NY: Cornell University Rehabilitation Research and Training Center on Disability Demographics and Statistics, 2008.

Federal Reserve Bank. *3-Month Treasury Bill Secondary Market Rate Discount Basis*. 2015. http://www.federalreserve.gov/releases/h15/data.htm (accessed January 2016).

—. *Market Yield on US Treasury Securities at 10-year Constant Maturity Quoted on Investment Basis*. 2015. http://www.federalreserve.gov/datadownload/Output.aspx?rel=H15&series=0b82b42463f 45dbb8fc097de06640ffc&lastObs=&from=&to=&filetype=csv&label=include&layout=s eriescolumn (accessed January 2016).

Field, Timothy. "Estimating Earning Capacity: Venues, Factors and Methods." *Estimating Earning Capacity: A Journal of Debate and Discussion* 1, no. 1 (2008).

*Frye v. United States*. 54 App. D.C. 46, 47, 293 F. 1013, 1014 (Court of Appeals D. C. Circuit, 1923).

Fuller-Thomson, Esme, and Meredith Minkler. "Functional Limitations Among Older American Indians and Alaska Natives: Findings from the Census 2000 Supplementary Survey." *American Journal of Public Health* 95, no. 11 (2005): 1945-1945.

Fuller-Thomson, Esme, and Tahany Gadalla. "Income inequality and limitations of activities of daily living: A multilevel analysis of the 2003 American Community Survey." *Public Health Journal of the Royal Institute of Public Health* 122 (2008): 221-228.

Gamboa, Anthony M. Jr., and David S. Gibson. *Gamboa Gibson Worklife Tables*. VEI Press, Revised 2015.

Gamboa, Anthony M. Jr. "Assessing Loss of Earning Capacity in MAID Cases." In *Litigating Major Auto Injury and Death Cases*, edited by Michael Freeman and Karen Koehler. Danvers, MA: Thomson West, 2006.

Gamboa, Anthony M. Jr. "Key Issues in Assessing Economic Damages in Cases of Aquired Brain Injury." *Brain Injury Professional* 3, no. 3 (2006): 36-37.

—. "Los Niveles de Ganancia y Empleo Para Personas con Traumatismo Cerebral Moderado: The Earnings Levels and Employment Levels for Persons Sustaining Mild Traumatic Brain Injury." *International meeting on Neurorehabilitation.* Havana, Cuba, 2008.

Gamboa, Anthony M. Jr. *Worklife Expectancy of Disabled Versus Non-disabled Persons by Sex and Level of Educational Attainment.* Louisville, KY: Vocational Economics Press, 1987.

Gamboa, Anthony M. Jr., and David S. Gibson. *Gamboa Gibson Worklife Tables.* Portland: Trial Guides, LLC, 2010.

Gamboa, Anthony M. Jr., and David S. Gibson. "The Employment Impact of Brain Injury: Data from the Latest Major Surveys." *Brain Injury, International Brain Injury Association* 22, no. supplemental 1 (2008).

Gamboa, Anthony M. Jr., and David S. Gibson. *The New Worklife Expectancy Tables: Revised 2006; By Gender, Level of Educational Attainment, and Level of Disability.* Louisville, KY: Vocational Econometrics, Inc., 2006.

Gamboa, Anthony M. Jr., David S. Gibson, and John P. Tierney. "Americans with Disabilities Act: Short Term Effects." *Paper presented at the Authors' Bazaar annual meeting of the American Law and Economics Association.* 1996.

Gamboa, Anthony M. Jr., et al. "A Vocational Economic Rationale." *Estimating Earning Capacity: A Journal of Debate and Discussion* 2, no. 2 (2009): 97-123.

Gamboa, Anthony M. Jr., Gwendolyn H. Holland, John P. Tierney, and David S. Gibson. "American Community Survey: Earnings and Employment for Persons with Traumatic Brain Injury." *NeuroRehabilitation* 21, no. 4 (2006): 327-333.

Gibson, David S. *Daubert, Disability, and Worklife Expectancy.* Louisville, KY: Vocational Econometrics, 2001.

—. "Improving Occupation Earnings Estimates through Segregation of Education Levels." *American Community Survey Data Users Group and United States Census Bureau.* Washington, DC, May 29, 2014.

—. "Use of ACS to Estimate Lifetime Loss of Earning Capacity as a Result of Disability." *Paper presented to the American Community Survey Data Users Conference and the United States Census Bureau.* College Park: ACS Data Users Group, 2015.

——. "Use of ACS to Improve Occupation Earnings Estimates." *Working paper presented to the 2015 IARP Annual Conference.* New Orleans, 2015.

Gibson, David S., and John P. Tierney. "Disability and Worklife Expectancy Tables: A Response." *Journal of Forensic Economics* 13, no. 3 (2000): 309-318.

Ginzberg, Eli, Sol Ginsberg, Sidney Axelrad, and John Herma. *Occupational Choice: An Approach to General Theory.* New York: Columbia University, 1951.

Gladwell, Malcolm. *Outliers: The Story of Success.* New York: Little Brown and Company, 2008.

Gongloff, Mark. "TIPS Yields Are Acting Like Politicians." *The Wall Street Journal*, March 12, 2008: C1.

Groves, Robert M. "The Pros and Cons of Making the Census Bureau's American Community Survey Voluntary." *Before the Subcommittee on Health Care.* District of Columbia, 2012.

Haber, Lawrence D. "Identifying the Disabled: Concepts and Methods in the Measurement of Disability." Social Security Bulletin, December 1967, 17-34.

Hale, Thomas W. "The Lack of a Disability Measure in Today's Current Population Survey." *Monthly Labor Review*, June 2001: 38-40.

Harkin, Tom. "Unfinished Business: Making Employment of People with Disabilities a National Priority." United States Senate Committee on Health, Education, Labor & Pensions, 2012.

Harris Interactive, Inc. "2000 N.O.D./Harris Survey of Americans With Disabilities." New York, 2000.

Harris, Benjamin H., Gerry Hendershot, and David C. Stapleton. *A Guide to Disability Statistics from the National Health Interview Survey.* Cornell University, Ithaca, NY: Rehabilitation Research and Training Center on Disability Demographics and Statistics, October 2005.

He, Wan, and Luke J. Larsen. *Older Americans with a Disability 2008-2012.* U.S. Census Burea, American Community Survey Reports ACS-29, Washington, D.C.: U.S. Government Printing Office, 2014.

Herrnstein, Richard J., and Charles Murray. *The Bell Curve: Intelligence and Class Structure in American Life.* New York: The Free Press, 1994.

Horner, Stephen M., and Frank Slesnick. "The Valuation of Earning Capacity Definition, Measurement and Evidence." *Journal of Forensic Economics* 12, no. 1 (1999): 13-32.

Houtenville, Andrew J. *2005 Disability Status Reports: United States.* Ithaca, NY: Cornell University/Hunter College Disability Statistics Rehabilitation Research and Training Center on Disability Demographics and Statistics, 2006.

Houtenville, Andrew J. *2013 Annual Compendium of Disability Statistics.* Durham, NH: University of New Hampshire, Institute on Disability, 2013.

Houtenville, Andrew J. *Economics of Disability Research Report #1: Estimates of the Prevalence Disability in the United States by State, 1981 through 1999.* U.S. Department of Education, National Institute on Disability and Rehabilitation Research, 2000.

Houtenville, Andrew J., David C. Stapleton, Robert R. Weathers, and Richard V. Burkhauser, . *Counting Working-Age People with Disabilities.* Kalamazoo, MI: W.E. Upjohn Institute for Employment Research, 2009.

*Jones and Laughlin Steel Corporation v. Howard E. Pfeifer.* 462 U.S. 523 (U.S. Supreme Court, 1983).

Kaiser Family Foundation and Health Research and Educational Trust. *2015 Employer Health Benefits Survey.* Melo Park, CA: Henry J. Kaiser Family Foundation and Health Research & Educational Trust, 2015.

Kapteyn, Arie, James P. Smith, and Arthur Van Soest. *Dynamics of Work Disability and Pain.* IZA Discussion Paper No. 2057, Institute for the Study of Labor, March 2006.

Kopcke, Richard W., and Ralph C. Kimball. "Inflation-Indexed Bonds: The Dog That Didn't Bark." *New England Economic Review*, January/February 1999: 3-24.

*Kumho Tire Company, Ltd. v. Patrick Carmichael.* 526 U.S. 137 (1999).

Lawlis, Frank, and Robert Male. "Methodological Issues: Interest Rate and Wage Growth Forecasting." *Journal of Legal Economics* 4, no. 3 (Winter 1994): 55-61.

McCollister, George M., and Christopher C. Pflaum. "Predicting Reduced Worklife from Disabilities." n.d.

McNeil, Jack. "Comment on Skoog and Toppino." n.d.

McNeil, John M. "Employment and Earnings of Individuals 18 to 64 by Disability Status: Data from the March 2000 Current Population Survey." *Presented at the annual meeting of the Southern Economic Association.* Washington, DC, November 10-12, 2000.

Meyer, Bruce D., and Wallace K.C. Mok. *Disability, Earnings, Income and Consumption.* Working Paper 18869, Cambridge: National Bureau of Economic Research, 2013.

Millimet, Daniel L., Michael Nieswiadomy, and Daniel Slottje. "Detailed Estimation or Worklife Expectancy for the Measurement of Human Capital: Accounting for Marriage and Children." *Journal of Economic Surveys* 24 (2010): 339-361.

Millimet, Daniel L., Michael Nieswiadomy, Hang Ryu, and Daniel Slottje. "Estimating Worklife Expectancies: An Econometric Approach." *Journal of Econometrics*, no. 113 (2003): 83-113.

Minkler, Meredith, Esme Fuller-Thomson, and Jack Guralnik. "Gradient of Disability across the Socioeconomic Spectrum in the United States." *The New England Journal of Medicine* 355, no. 7 (2006): 699-703.

National Academy of Sciences, Committee on Occupational Classification and Analysis. *Dictionary of Occupational Titles.* Edited by Inter-university Consortium for Political and Social Research. Washington, D.C.: U.S. Department of Commerce, Bureau of the Census, 1981.

Newman, L., et al. *The Post-High School Outcomes of Young Adults with Disabilities up to 8 Years After High School. A Report From the National Longitudinal Transition Study-2 (NLTS2).* (NCSER 2011-3005, Menlo Park, CA: SRI International, 2011.

*O'Shea v. Riverway Towing Company.* 677 F. 2d 1194 (1982).

Pelaez, Rolondo F. "Pennsylvania's Offset Rule: Fantasy Masquerading as Economics." *Journal of Legal Economics*, Winter 1995: 1-16.

Pelaez, Rolondo F. "The Total Offset Method." *Journal of Forensic Economics*, April 1989: 45-60.

Richards, Hugh, and Michael Donaldson. *Life and Worklife Expectancies.* 2nd. Tucson, AZ: Lawyers & Judges Publishing Company, Inc., 2010.

Rishe, Patrick. "The Vocational Economics Behind The $765 Million NFL Concussion Settlement." 8 30, 2013. http://www.forbes.com/sites/prishe/2013/08/30/the-vocational-economics-behind-the-765-million-nfl-concussion-settlement/ (accessed 9 11, 2013).

Rubin, Robert E. *In An Uncertain World.* New York: Random House Trade, 2003.

Schwartz, Eli. "Below-Market Interest Rates and the Total Offset Method Re-Visited." *Journal of Forensic Economics*, Winter 1997: 91-94.

Schwartz, Eli. "Settling Claims for Lost Income: The Total Offset Method." *Dickinson Law Review* 104, no. 4 (Summer 2000): 679-686.

Schwartz, Eli, and Robert Thornton. "The Effect of Taxes and Inflation on the Real Interest Rate." *Journal of Forensic Economics*, Winter 1991: 71-73.

Sevak, Purvi, Andrew Houtenville, Debra Brucker, and John O'Neill. "Individual Characteristics and the Disability Employment Gap." *Journal of Disability Policy Studies* (Mathematica Policy Research) 26, no. 2 (September 2015): 80-88.

Shen, Pu, and Jonathan Corning. "Can TIPS Help Identify Long-Term Inflation Expectations?" *Economic Review*, 2001: 61-87.

Skoog, Gary R., and David C. Toppino. "Disability and the New Worklife Expectancy Tables from Vocational Econometrics, 1998: A Critical Analysis." *Journal of Forensic Economics* 12, no. 3 (1999): 239-254.

Smith, Diane. "The Relationship of Type of Disability and Employment Status in the United States from the Behavioral Risk Factor Surveillance System." *Journal of Rehabilitation* 73, no. 2 (2007): 32-40.

Stern, Bruce H. "Discounting to Present Value: Is It Necessary to Reduce?" 2005.

Super, Donald. *The Psychology of Careers.* New York: Harper and Row, 1957.

Tennant, Jennifer. "Disability, employment, and income: are Iraq/Afghanistan-era U.S. veterans unique?" *Monthly Labor Review*, August 2012: 3-8.

Tierney, John P. and Missun, Ronald E. "Defining Earning Capacity: A Process Paradigm." *Journal of Forensic Vocational Assessment*, 2001: 3-12.

U. S. Bureau of Labor Statistics. *Data on the employment status of people with a disability.* August 25, 2010. http://www.bls.gov/cps/cpsdisability.htm (accessed April 2015).

—. *Table A-6. Employment status of the civilian population by sex, age, and disability status.* March 6, 2015. http://www.bls.gov/news.release/empsit.t06.htm (accessed March 12, 2015).

U. S. Department of Labor Office of Disability Employment Policy. *Disability Employment Statistics.* 2014. http://www.dol.gov/odep/topics/DisabilityEmploymentStatistics.htm (accessed March 12, 2015).

U.S. Bureau of Labor Statistics. *Consumer Price Index, All Urban Consumers (CPI-U), U.S. City Average.* 2015. http://data.bls.gov/cgi-bin/srgate (Use Series ID #: CUUR0000SA0) (accessed December 2015).

—. *Data on the employment status of people with a disability.* June 16, 2015. http://www.bls.gov/cps/cpsdisability.htm (accessed December 2015).

U.S. Bureau of Labor Statistics. "Employer Costs for Employee Compensation - September 2015." http://www.bls.gov/ncs/ect/home.htm, Washington, D.C., 2015.

—. *Major Sector Productivity and Costs Index: Business Sector, Hourly Compensation.* 2014. http://data.bls.gov/cgi-bin/srgate (use Series ID #: PRS84006103) (accessed December 30, 2015).

——. *National Employment, Hours, and Earnings: Average Hourly Earnings of Production Workers.* 2015. http://data.bls.gov/cgi-bin/srgate (Use Series ID #: CEU0500000008) (accessed December 2015).

——. *Occupational Employment Statistics.* May 2014. http://www.bls.gov/oes/home.htm (accessed December 2015).

U.S. Census Bureau. "ACS Public Use Microdata Sample (PUMS)." 2015. http://www.census.gov/programs-surveys/acs/data/pums.html (accessed December 2015).

U.S. Census Bureau. *American Community Survey Handbook of Questions and Current Federal Uses.* U.S. Department of Commerce Economics and Statistics Administration, October 2014.

——. *CPS Annual Social & Economic Supplement (CPS ASEC).* 11 14, 2012. http://www.census.gov/people/disability/methodology/cps.html (accessed December 2015).

——. *Current Population Survey (CPS).* 2012. http://www.census.gov/cps (accessed December 2015).

——. *Disability.* 2013. http://www.census.gov/people/disability/ (accessed December 2015).

——. *Guidance on Differences in Employment and Unemployment Estimates from Different Sources.* 2013. http://www.census.gov/hhes/www/laborfor/laborguidance092209.html (accessed June 2014).

U.S. Census Bureau. *Labor Force Status and Other Characteristics of Persons with a Work Disability 1981-1988.* Current Population Reports, Washington, D.C.: U.S. Government Printing Office, 1989, 23-160.

U.S. Census Bureau. *Labor Force Status and Other Characteristics of Persons with a Work Disability: 1982.* Current Population Reports, Washington, D.C.: U.S. Government Printing Office, 1983, 23-127.

——. *Public Use Files from the March Current Population Survey (CPS).* 1998 forward. http://dataferrett.census.gov/LaunchDFA.html (accessed December 2015).

Weathers, Robert R. *A Guide to Disability Statistics from the American Community Survey.* Ithaca, NY: Cornell University Rehabilitation Research and Training Center on Disability Demographics and Statistics, 2005.

Yelin, Edward. "The Labor Market and Persons with and without Disabilities: Analysis of the 1993 through 1995 Current Population Surveys." *Conference on Employment and Return to Work for People with Disabilities.* Office of Disability, Social Security Administration and National Institute on Disability and Rehabilitation Research, 1996.

Yin, Michelle, Dahlia Shaewitz, and Mahlet Megra. *An Uneven Playing Field: The Lack of Equal Pay for People with Disabilities.* Washington, D.C.: American Institutes for Research, December 2014.

Revised 2/1/2016 © *Copyright 2016Vocational Economics, Inc.* Vocational Economic Rationale

**WORKLIFE EXPECTANCY**

**AMERICAN COMMUNITY SURVEY**

A worklife expectancy statistically estimates how long a person will work over a lifetime. Predictors of worklife are age, level of educational attainment, gender, and disability status. The likelihood of work is calculated from a specific age through the end of the analysis. Each statistical interval in the worklife pattern represents the joint probability that an individual is alive, in the labor force, and actually employed. The statistical intervals are then summed thereby determining the worklife expectancy in years, the format in which worklife expectancies are typically presented.

Sources:
National Center for Health Statistics, Life Tables home page:
http://www.cdc.gov/nchs/products/pubs/pubd/lftbls/life/1966.htm

US Census Bureau. Public Use Data Files from the American Community Survey. ACS Website: http://www.census.gov/acs/www/index.html

*CRAIG AMOS, August 1, 2016*

*Page 42 of 47*

# Worklife Probability
## Craig Amos
## Analysis Median

|  | Before Termination | After Termination Median | Value/Diff |
|---|---|---|---|
| Birth Year |  |  | ████ |
| Termination date |  |  | 6/6/2014 |
| Analysis Date |  |  | 7/29/2016 |
| Base Wage | 43,933 | 33,120 | 24.6% |
| Fringe Rates | 35.6% | 26.2% |  |
| Education Level | GED or Alt. Credential | GED or Alt. Credential |  |
| Gender Life/Emp. |  |  | Male |
| Disab. Status | Cognitive Nonsevere | Cognitive Nonsevere |  |
| Growth/Discount |  |  | Pure Offset |
| Future Worklife | 6.2 | 6.2 | 0.0% |
| Total Earnings | 407,840 | 261,191 | 146,649 |

| Mo/Yr | Age | Years | Prob. Life | Prob. Empl. | Prob. Work | Base Earning | Adjusted Earnings | Prob. Empl. | Prob. Work | Base Earning | Adjusted Earnings |
|---|---|---|---|---|---|---|---|---|---|---|---|
|  |  |  |  |  |  | **Before Termination** |  |  | **After Termination Median** |  |  |
| 6/2014 | 40.01 | 0.99 | 1.000 | 0.285 | 0.282 | 42,252 | 16,157 |  |  |  | - |
| 6/2015 | 41.00 | 1.00 | 1.000 | 0.285 | 0.285 | 43,133 | 16,669 |  |  |  | - |
| 6/2016 | 42.00 | 0.16 | 1.000 | 0.285 | 0.046 | 43,933 | 2,740 |  |  |  | - |
| **Past Totals** |  | **2.15** |  |  | **0.613** |  | **35,566** |  | **0.000** |  | - |
| **Past Loss** |  |  |  |  |  |  |  |  |  |  | **35,566** |
| 7/2016 | 42.16 | 0.84 | 0.998 | 0.285 | 0.239 | 43,933 | 14,238 | 0.285 | 0.239 | 33,120 | 9,990 |
| 6/2017 | 43.00 | 1.00 | 0.995 | 0.285 | 0.284 | 43,933 | 16,919 | 0.285 | 0.284 | 33,120 | 11,870 |
| 6/2018 | 44.00 | 1.00 | 0.992 | 0.285 | 0.283 | 43,933 | 16,859 | 0.285 | 0.283 | 33,120 | 11,829 |
| 6/2019 | 45.00 | 1.00 | 0.989 | 0.297 | 0.294 | 43,933 | 17,515 | 0.297 | 0.294 | 33,120 | 12,288 |
| 6/2020 | 46.00 | 1.00 | 0.985 | 0.297 | 0.293 | 43,933 | 17,455 | 0.297 | 0.293 | 33,120 | 12,247 |
| 6/2021 | 47.00 | 1.00 | 0.981 | 0.297 | 0.291 | 43,933 | 17,336 | 0.297 | 0.291 | 33,120 | 12,163 |
| 6/2022 | 48.00 | 1.00 | 0.977 | 0.297 | 0.290 | 43,933 | 17,276 | 0.297 | 0.290 | 33,120 | 12,121 |
| 6/2023 | 49.00 | 1.00 | 0.973 | 0.297 | 0.289 | 43,933 | 17,217 | 0.297 | 0.289 | 33,120 | 12,079 |
| 6/2024 | 50.00 | 1.00 | 0.967 | 0.245 | 0.237 | 43,933 | 14,119 | 0.245 | 0.237 | 33,120 | 9,906 |
| 6/2025 | 51.00 | 1.00 | 0.962 | 0.245 | 0.236 | 43,933 | 14,059 | 0.245 | 0.236 | 33,120 | 9,864 |
| 6/2026 | 52.00 | 1.00 | 0.956 | 0.245 | 0.234 | 43,933 | 13,940 | 0.245 | 0.234 | 33,120 | 9,781 |
| 6/2027 | 53.00 | 1.00 | 0.950 | 0.245 | 0.233 | 43,933 | 13,881 | 0.245 | 0.233 | 33,120 | 9,739 |
| 6/2028 | 54.00 | 1.00 | 0.943 | 0.245 | 0.231 | 43,933 | 13,761 | 0.245 | 0.231 | 33,120 | 9,655 |
| 6/2029 | 55.00 | 1.00 | 0.936 | 0.230 | 0.215 | 43,933 | 12,808 | 0.230 | 0.215 | 33,120 | 8,986 |
| 6/2030 | 56.00 | 1.00 | 0.928 | 0.230 | 0.213 | 43,933 | 12,689 | 0.230 | 0.213 | 33,120 | 8,903 |
| 6/2031 | 57.00 | 1.00 | 0.919 | 0.230 | 0.211 | 43,933 | 12,570 | 0.230 | 0.211 | 33,120 | 8,819 |
| 6/2032 | 58.00 | 1.00 | 0.910 | 0.230 | 0.209 | 43,933 | 12,451 | 0.230 | 0.209 | 33,120 | 8,736 |
| 6/2033 | 59.00 | 1.00 | 0.901 | 0.230 | 0.207 | 43,933 | 12,332 | 0.230 | 0.207 | 33,120 | 8,652 |
| 6/2034 | 60.00 | 1.00 | 0.891 | 0.144 | 0.128 | 43,933 | 7,625 | 0.144 | 0.128 | 33,120 | 5,350 |
| 6/2035 | 61.00 | 1.00 | 0.881 | 0.144 | 0.127 | 43,933 | 7,566 | 0.144 | 0.127 | 33,120 | 5,308 |
| 6/2036 | 62.00 | 1.00 | 0.870 | 0.144 | 0.125 | 43,933 | 7,447 | 0.144 | 0.125 | 33,120 | 5,225 |
| 6/2037 | 63.00 | 1.00 | 0.858 | 0.144 | 0.124 | 43,933 | 7,387 | 0.144 | 0.124 | 33,120 | 5,183 |
| 6/2038 | 64.00 | 1.00 | 0.846 | 0.144 | 0.122 | 43,933 | 7,268 | 0.144 | 0.122 | 33,120 | 5,099 |
| 6/2039 | 65.00 | 1.00 | 0.833 | 0.152 | 0.127 | 43,933 | 7,566 | 0.152 | 0.127 | 33,120 | 5,308 |
| 6/2040 | 66.00 | 1.00 | 0.819 | 0.152 | 0.124 | 43,933 | 7,387 | 0.152 | 0.124 | 33,120 | 5,183 |
| 6/2041 | 67.00 | 1.00 | 0.804 | 0.152 | 0.122 | 43,933 | 7,268 | 0.152 | 0.122 | 33,120 | 5,099 |
| 6/2042 | 68.00 | 1.00 | 0.788 | 0.152 | 0.120 | 43,933 | 7,149 | 0.152 | 0.120 | 33,120 | 5,016 |
| 6/2043 | 69.00 | 1.00 | 0.771 | 0.152 | 0.117 | 43,933 | 6,970 | 0.152 | 0.117 | 33,120 | 4,890 |
| 6/2044 | 70.00 | 1.00 | 0.753 | 0.147 | 0.111 | 43,933 | 6,613 | 0.147 | 0.111 | 33,120 | 4,640 |
| 6/2045 | 71.00 | 1.00 | 0.733 | 0.147 | 0.108 | 43,933 | 6,434 | 0.147 | 0.108 | 33,120 | 4,514 |

8/1/2016

| Mo/Yr | Age | Years | Prob. Life | Before Termination | | | | After Termination Median | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | Prob. Empl. | Prob. Work | Base Earning | Adjusted Earnings | Prob. Empl. | Prob. Work | Base Earning | Adjusted Earnings |
| 6/2046 | 72.00 | 1.00 | 0.713 | 0.147 | 0.105 | 43,933 | 6,255 | 0.147 | 0.105 | 33,120 | 4,389 |
| 6/2047 | 73.00 | 1.00 | 0.691 | 0.147 | 0.102 | 43,933 | 6,076 | 0.147 | 0.102 | 33,120 | 4,263 |
| 6/2048 | 74.00 | 1.00 | 0.668 | 0.147 | 0.098 | 43,933 | 5,838 | 0.147 | 0.098 | 33,120 | 4,096 |
| Future Totals | | 32.84 | | | 6.249 | | 372,274 | | 6.249 | | 261,191 |
| Future Loss | | | | | | | | | | | 111,083 |
| Gr. Total | | 34.99 | | | 6.862 | | 407,840 | | 6.249 | | 261,191 |
| Total Loss | | | | | | | | | | | 146,649 |

**_Citations_**

Arias, Elizabeth. National Vital Statistics Report, vol. 64 no. 11, United States Life Tables, 2011. National Center for Health Statistics, U.S. Center for Disease Control and Prevention, Hyattsville, MD, 2015. http://www.cdc.gov/nchs/data/nvsr/nvsr64_11.pdf (accessed September 2015).

U.S. Census Bureau. American Community Survey (ACS) Public Use Microdata Sample (PUMS). American FactFinder. 2010-2014 1-year PUMS files. http://www.census.gov/programs-surveys/acs/data/pums.html (accessed November 2015).

8/1/2016

## Craig Amos
## Analysis 25th Percentile

| | Before Termination | After Termination 25th percentile | Value/Diff |
|---|---|---|---|
| Birth Year | | | ███████ |
| Termination date | | | 6/6/2014 |
| Analysis Date | | | 7/29/2016 |
| Base Wage | 43,933 | 20,700 | 52.9% |
| Fringe Rates | 35.6% | 26.2% | |
| Education Level | GED or Alt. Credential | GED or Alt. Credential | |
| Gender Life/Emp. | | | Male |
| Disab. Status | Cognitive Nonsevere | Cognitive Nonsevere | |
| Growth/Discount | | | Pure Offset |
| Future Worklife | 6.2 | 6.2 | 0.0% |
| Total Earnings | 407,840 | 163,246 | 244,594 |

| | | | | Before Termination | | | | After Termination 25th percentile | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Mo/Yr | Age | Years | Prob. Life | Prob. Empl. | Prob. Work | Base Earning | Adjusted Earnings | Prob. Empl. | Prob. Work | Base Earning | Adjusted Earnings |
| 6/2014 | 40.01 | 0.99 | 1.000 | 0.285 | 0.282 | 42,252 | 16,157 | | | | - |
| 6/2015 | 41.00 | 1.00 | 1.000 | 0.285 | 0.285 | 43,133 | 16,669 | | | | - |
| 6/2016 | 42.00 | 0.16 | 1.000 | 0.285 | 0.046 | 43,933 | 2,740 | | | | - |
| Past Totals | | 2.15 | | | 0.613 | | 35,566 | | 0.000 | | - |
| Past Loss | | | | | | | | | | | 35,566 |
| 7/2016 | 42.16 | 0.84 | 0.998 | 0.285 | 0.239 | 43,933 | 14,238 | 0.285 | 0.239 | 20,700 | 6,243 |
| 6/2017 | 43.00 | 1.00 | 0.995 | 0.285 | 0.284 | 43,933 | 16,919 | 0.285 | 0.284 | 20,700 | 7,419 |
| 6/2018 | 44.00 | 1.00 | 0.992 | 0.285 | 0.283 | 43,933 | 16,859 | 0.285 | 0.283 | 20,700 | 7,393 |
| 6/2019 | 45.00 | 1.00 | 0.989 | 0.297 | 0.294 | 43,933 | 17,515 | 0.297 | 0.294 | 20,700 | 7,680 |
| 6/2020 | 46.00 | 1.00 | 0.985 | 0.297 | 0.293 | 43,933 | 17,455 | 0.297 | 0.293 | 20,700 | 7,654 |
| 6/2021 | 47.00 | 1.00 | 0.981 | 0.297 | 0.291 | 43,933 | 17,336 | 0.297 | 0.291 | 20,700 | 7,602 |
| 6/2022 | 48.00 | 1.00 | 0.977 | 0.297 | 0.290 | 43,933 | 17,276 | 0.297 | 0.290 | 20,700 | 7,576 |
| 6/2023 | 49.00 | 1.00 | 0.973 | 0.297 | 0.289 | 43,933 | 17,217 | 0.297 | 0.289 | 20,700 | 7,550 |
| 6/2024 | 50.00 | 1.00 | 0.967 | 0.245 | 0.237 | 43,933 | 14,119 | 0.245 | 0.237 | 20,700 | 6,191 |
| 6/2025 | 51.00 | 1.00 | 0.962 | 0.245 | 0.236 | 43,933 | 14,059 | 0.245 | 0.236 | 20,700 | 6,165 |
| 6/2026 | 52.00 | 1.00 | 0.956 | 0.245 | 0.234 | 43,933 | 13,940 | 0.245 | 0.234 | 20,700 | 6,113 |
| 6/2027 | 53.00 | 1.00 | 0.950 | 0.245 | 0.233 | 43,933 | 13,881 | 0.245 | 0.233 | 20,700 | 6,087 |
| 6/2028 | 54.00 | 1.00 | 0.943 | 0.245 | 0.231 | 43,933 | 13,761 | 0.245 | 0.231 | 20,700 | 6,035 |
| 6/2029 | 55.00 | 1.00 | 0.936 | 0.230 | 0.215 | 43,933 | 12,808 | 0.230 | 0.215 | 20,700 | 5,617 |
| 6/2030 | 56.00 | 1.00 | 0.928 | 0.230 | 0.213 | 43,933 | 12,689 | 0.230 | 0.213 | 20,700 | 5,564 |
| 6/2031 | 57.00 | 1.00 | 0.919 | 0.230 | 0.211 | 43,933 | 12,570 | 0.230 | 0.211 | 20,700 | 5,512 |
| 6/2032 | 58.00 | 1.00 | 0.910 | 0.230 | 0.209 | 43,933 | 12,451 | 0.230 | 0.209 | 20,700 | 5,460 |
| 6/2033 | 59.00 | 1.00 | 0.901 | 0.230 | 0.207 | 43,933 | 12,332 | 0.230 | 0.207 | 20,700 | 5,408 |
| 6/2034 | 60.00 | 1.00 | 0.891 | 0.144 | 0.128 | 43,933 | 7,625 | 0.144 | 0.128 | 20,700 | 3,344 |
| 6/2035 | 61.00 | 1.00 | 0.881 | 0.144 | 0.127 | 43,933 | 7,566 | 0.144 | 0.127 | 20,700 | 3,318 |
| 6/2036 | 62.00 | 1.00 | 0.870 | 0.144 | 0.125 | 43,933 | 7,447 | 0.144 | 0.125 | 20,700 | 3,265 |
| 6/2037 | 63.00 | 1.00 | 0.858 | 0.144 | 0.124 | 43,933 | 7,387 | 0.144 | 0.124 | 20,700 | 3,239 |
| 6/2038 | 64.00 | 1.00 | 0.846 | 0.144 | 0.122 | 43,933 | 7,268 | 0.144 | 0.122 | 20,700 | 3,187 |
| 6/2039 | 65.00 | 1.00 | 0.833 | 0.152 | 0.127 | 43,933 | 7,566 | 0.152 | 0.127 | 20,700 | 3,318 |
| 6/2040 | 66.00 | 1.00 | 0.819 | 0.152 | 0.124 | 43,933 | 7,387 | 0.152 | 0.124 | 20,700 | 3,239 |
| 6/2041 | 67.00 | 1.00 | 0.804 | 0.152 | 0.122 | 43,933 | 7,268 | 0.152 | 0.122 | 20,700 | 3,187 |
| 6/2042 | 68.00 | 1.00 | 0.788 | 0.152 | 0.120 | 43,933 | 7,149 | 0.152 | 0.120 | 20,700 | 3,135 |
| 6/2043 | 69.00 | 1.00 | 0.771 | 0.152 | 0.117 | 43,933 | 6,970 | 0.152 | 0.117 | 20,700 | 3,056 |
| 6/2044 | 70.00 | 1.00 | 0.753 | 0.147 | 0.111 | 43,933 | 6,613 | 0.147 | 0.111 | 20,700 | 2,900 |
| 6/2045 | 71.00 | 1.00 | 0.733 | 0.147 | 0.108 | 43,933 | 6,434 | 0.147 | 0.108 | 20,700 | 2,821 |

8/1/2016

| Mo/Yr | Age | Years | Prob. Life | Before Termination | | | | After Termination 25th percentile | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | Prob. Empl. | Prob. Work | Base Earning | Adjusted Earnings | Prob. Empl. | Prob. Work | Base Earning | Adjusted Earnings |
| 6/2046 | 72.00 | 1.00 | 0.713 | 0.147 | 0.105 | 43,933 | 6,255 | 0.147 | 0.105 | 20,700 | 2,743 |
| 6/2047 | 73.00 | 1.00 | 0.691 | 0.147 | 0.102 | 43,933 | 6,076 | 0.147 | 0.102 | 20,700 | 2,665 |
| 6/2048 | 74.00 | 1.00 | 0.668 | 0.147 | 0.098 | 43,933 | 5,838 | 0.147 | 0.098 | 20,700 | 2,560 |
| Future Totals | | 32.84 | | | 6.249 | | 372,274 | | 6.249 | | 163,246 |
| Future Loss | | | | | | | | | | | 209,028 |
| Gr. Total | | 34.99 | | | 6.862 | | 407,840 | | 6.249 | | 163,246 |
| Total Loss | | | | | | | | | | | 244,594 |

### Citations

Arias, Elizabeth. National Vital Statistics Report, vol. 64 no. 11, United States Life Tables, 2011. National Center for Health Statistics, U.S. Center for Disease Control and Prevention, Hyattsville, MD, 2015. http://www.cdc.gov/nchs/data/nvsr/nvsr64/nvsr64_11.pdf (accessed September 2015).

U.S. Census Bureau. American Community Survey (ACS) Public Use Microdata Sample (PUMS). American FactFinder. 2010-2014 1-year PUMS files. http://www.census.gov/programs-surveys/acs/data/pums.html (accessed November 2015).

8/1/2016

**Craig Amos**
**Fringe Benefits Analysis**

**Wage Base** 43,933

| Item | Percentage | Amount | Source |
|------|-----------|--------|--------|
| Social Security | 6.2% | 2,724 | ssa.gov |
| Health Insurance | 27.4% | 12,028 | paystub AMOS 0196; Kaiser TN |
| 401 K | 2.0% | 879 | 2013 W2 Form 12bD |
| **Totals** | **35.6%** | **15,631** | |

Curriculum Vitae


**Linda Jones, MRC, MBA, MPA, CRC**

**BUSINESS ADDRESS**

Vocational Economics, Inc.
3200 West End Avenue, Suite 500
Nashville, TN 37203
Phone: (615) 244-8480
FAX: (502) 589-2750


**DATE OF BIRTH:** ██████████

**EDUCATION:**

| | |
|---|---|
| 9/03 to 5/05 | University of Kentucky, Lexington, Kentucky<br>*Master of Rehabilitation Counseling* |
| 5/03 to 6/03 | Indiana University Southeast, New Albany, Indiana<br>*Graduate coursework in Labor Economics* |
| 6/00 to 8/02 | University of Louisville, Louisville, Kentucky<br>*Master of Business Administration* |
| 6/95 to 12/99 | University of Louisville, Louisville, Kentucky<br>*Master of Public Administration. Focus: Labor-Management Relations* |
| 8/81 to 5/85 | Western Kentucky University, Bowling Green, Kentucky<br>*Bachelor of Arts.*<br>*Major: Public Relations/Journalism. Minor: Business Administration* |

**CREDENTIALS:**

| | |
|---|---|
| 2010 | Approved provider for Ohio Bureau of Workers' Compensation. |
| 2006 to 2008 | Rehabilitation Student Practicum and Internship Advisor, University of Kentucky. |
| 2006 to present | Vocational Expert, U.S. Department of Health and Human Services, Social Security Administration, Office of Disability Adjudication and Review. |
| 2005 to present | Certified Rehabilitation Counselor, #00084603. Valid through: 3/31/2020. |
| 1998 | Kentucky Community Education Professional Credential. |

## WORK EXPERIENCE:

6/98 to present      Vocational Economics, Inc., Louisville, Kentucky

Vocational Economic Analyst, May 2005 to present
*Analyze loss of earning capacity in cases of total disability, partial disability, and death. Provide vocational rehabilitation counseling, assessments, and consultation to clients with and without disabilities.*

Case Manager, June 1998 to April 2005
*Assisted experts in analyzing loss of earning capacity in cases of total disability, partial disability, and death. Managed and coordinated case intake and report preparation.*

7/91 to 6/98      Oldham County Schools, Buckner, Kentucky

Director, Community Education and Development
*Established and managed an adult and community education program and classes of a vocational nature. Developed grant proposals and coordinated activities of local educational foundation.*

11/90 to 7/91      The Salvation Army, Kentucky-Tennessee Division, Louisville, Kentucky
Assistant to Development Director
*Assisted Development Director with fundraising and grant writing.*

1/87 to 10/90      Dun and Bradstreet Information Resources, Louisville, Kentucky
Business Analyst
*Called on business owners to update their Business Information Report. Analyzed financial and operational information.*

6/85 to 5/86      Bowling Green Independent Schools, Bowling Green, Kentucky
Community Relations Coordinator
*Managed communications program, wrote and designed publications, planned and implemented community projects, and coordinated media relations program.*

## PRESENTATIONS AND PUBLICATIONS:

Jones, Linda L. "Complications in Assessments of Lost Earnings." Kentucky Continuing Legal Education Presentation, Marriott Louisville Downtown, Louisville, KY, March 14, 2014.

Jones, Linda L. and David S. Gibson. "Disability and Employment Data from the U.S. Census Bureau." Presentation given at the Southeast Regional National Rehabilitation Association Training Conference, Louisville, KY, May 14-16, 2013.

Jones, Linda L. "Measuring Earning Capacity Loss." Tennessee Continuing Legal Education Presentation, Nashville, TN, April 25, 2013.

Jones, Linda L. "Trends in Vocational Evaluation." Tennessee Association for Justice Workers' Compensation Seminar, Nashville, TN, November 2, 2012.

Jones, Linda L. and Ronald E. Missun. "Measuring Earning Capacity Loss." Kentucky Continuing Legal Education Presentation, East Kentucky Expo Center, Pikeville, KY, November 9, 2012.

Jones, Linda L. Contributing Editor, *Journal of Forensic Rehabilitation Abstracts*, *1*(1), July 2011.

Gamboa, Anthony M Jr., et al. "A Vocational Economic Rationale." Estimating Earning Capacity: A Journal of Debate and Discussion 2, no. 2 (2009): 97-123.

Jones, Linda L. and Laura Lampton. Lecture given to pre-trial litigation class at University of Louisville Law School, Louisville, KY, October 28, 2009.

Jones, Linda L. "Making Sense of Vocational Evaluation." Presentation given at ING's ROSE Seminar, Minneapolis, MN, September 30, 2009.

Jones, Linda L. "Basics of Vocational Evaluation." Presentation given at the Nashville Association of Legal Secretaries Lunch and Learn Series, Nashville, TN, September 10, 2008.

Gamboa, Anthony M., Jr., and Linda L. Jones. "Understanding Worklife Expectancy." *Journal of Forensic Vocational Analysis* 9, no. 1 (Summer 2006): 33-41.

Jones, Linda L. and Ronald E. Missun. "Conventional Wisdom: Implications for Lost Earnings in Permanent Disability Cases." Presentation given at a meeting for attorneys (sponsored by Vocational Economics, Inc.), Bowling Green, KY, June 30, 2006.

Jones, Linda L. "Proving Lost Earnings at Trial." Presentation given at meeting of the Kentucky Academy of Trial Attorneys, *Auto Litigation: New Approaches to Presenting Damages at Trial*, Bowling Green, KY, June 9, 2006

Jones, Linda L. and Ronald E. Missun. "Conventional Wisdom: Implications for Lost Earnings in Permanent Disability Cases." Nashville, TN, May 26, 2006.

Gamboa, Anthony M., Jr., and Linda L. Jones. "Loss of Earning Capacity of a Child with Brachial Plexus Injury." Presentation given at the annual meeting of the International Association of Rehabilitation Professionals, Minneapolis, MN, May 19-21, 2006.

Holland, Gwendolyn H., Linda L. Jones, David S. Gibson and John P. Tierney. "Career Development and Disability." (*Unpublished manuscript*), 2005.

Gamboa, Anthony M., Jr. and Linda L. Jones "Calculating Loss of Earning Capacity". Presentation given to the Kentucky Academy of Trial Attorneys, Louisville, Kentucky, September 2004.

Jones, Linda L. "Labor Market Access and Worker Trait Characteristics." Presentation given to the Louisville Bar Association Social Security Section, Louisville, Kentucky, December 2002.

Gamboa, Anthony M., Jr. and Jones, Linda L. "Introduction to Assessment of Lost Earnings." Presentation given to Louisville Association of Paralegals, Louisville, Kentucky, March 2000.

Jones, Linda L. "Grant Writing Techniques," Presentation given at the Regions IV and V Adult Education and State ESL Conference, Lexington, Kentucky, February 1998.

## HONORS AND RECOGNITIONS:

Philanthropist Award, Junior League of Louisville, 2007.

University of Kentucky, Millennium Fellowship, 2003-2004.

Kentucky Community Education Five Star Program Award, 1994 and 1996.

## SERVICE, CIVIC AND COMMUNITY INVOLVEMENT:

| | |
|---|---|
| 1994, 1996 | Reviewer, U.S. Environmental Protection Agency Education Grants Program. |
| 1997 thru 2008 | Councilmember, Lyndon City Council, Lyndon, Kentucky. |
| 1998 to 2006, 2008 to 2009 | Louisville (Kentucky) Alumnae Panhellenic. President 2005-2006, Treasurer 2003-2005, Scholarship Chairman 2002-2003. |
| 2000 | Grant Application Reviewer, Louisville/Jefferson County Workforce Investment Board. |
| 2000 to 2003 | Kentuckiana Works Disabled Placement Task Force. |
| 2001 to 2002 | Skills USA Foundation Board, Kentucky Vocational Industrial Clubs of America. |
| 2002 to 2003 | Jefferson County (Kentucky) Board of Zoning Adjustment. |
| 2003 to present | Junior League of Louisville, Louisville, Kentucky. |
| 2004 to present | Trinity Presbyterian Church, Louisville, Kentucky. 2013-2015 Board of Deacons. |
| 2005 to present | International Association of Rehabilitation Professionals. |
| 2007 to present | National Rehabilitation Association. |
| 2008-2010 | Appointed to Kentucky Early Childhood Development Authority Board of Directors by Governor Steve Beshear. Two-year term. |

2010                 Selected as Item Writer for the *Certified Rehabiliation Counselor (CRC)*
                     Examination.  Item Writing Workshop, Schaumburg, IL, October 21-23, 2010.

2012 to present      The Fillies, Inc., Louisville, KY.

                          Updated:  July 22, 2015

# Testimony Report: Linda L. Jones

1/2012 through 8/1/2016

| Date | Case Name | Testimony Type | Court |
|---|---|---|---|
| 7/25/16 | Amanda & Bryan Snook vs. Citicorp North America, Inc., and Thomas H. Ruedi [14-CI-04505] | Deposition | Jefferson Co. KY Circuit Court, Div. 1 (KY) |
| 7/6/16 | Nancy J. Goetschius vs. Brian C. McCarron, et al [24-C-15-003421] | Deposition | Circuit Court, Baltimore City and State of Marylan (KY) |
| 6/20/16 | Harold Merritt vs. Catholic Health Initiatives, Dr. Smith, Kentucky One & First Initiatives Ins. [15-CI-03690] | Deposition | Fayette Co. Circuit Court, 7th Div, Lexington, KY (KY) |
| 6/6/16 | Tammy Boggs, et al vs. Bull Co, LLC, et al [15-CI-00102] | Deposition | Harlan County (KY) Circuit Court, Harlan, KY (KY) |
| 5/26/16 | Roger Yan vs. Angela Ma [15-CI-500791] | Court | Jefferson County (KY) Circuit/Family Court Div. 9 (KY) |
| 4/15/16 | Darlene Varney Administratrix vs. St. Elizabeth Medical Center, Inc. et al [14-CI-00870] | Deposition | Campbell Co. Kentucky Circuit Court, Div, 2 (KY) |
| 2/18/16 | Shawn Lee Wright v. Sanda Jean Wright [15-CI-00439] | Court | Bullitt Circuit Court, Family Court (KY) |
| 1/30/15 | Denise & Anthony Keith v. Talon Logistics Services, et. al. [13-CI-05655] | Deposition | Jefferson Co. (KY) Circuit Court, Div. 7 (KY) |
| 9/9/15 | Toby S. Maggard vs. Greg Potter and Double Q. Trucking, LLC [14-CI-166] | Evidentiary Deposition | Perry County Kentucky (Hazard) Circuit Court (KY) |
| 9/2/15 | Deborah Christie DDS vs. Edward Britt Brockman, MD [22D031201-CT25] | Court | Floyd Co. (IN) Superior Court, New Albany, IN (IN) |
| 8/20/15 | Kenneth Bisig et al vs Time Warner Cable [3-14-cv-00036-DJH-DW] | Deposition | U.S. Federal Dist. Court, Western District of KY (KY) |
| 8/18/15 | Tracy J. & Michael Nolin vs. Kroger Co. [2013-370] | Deposition | Circuit Court Williamson Co. TN (TN) |
| 8/12/15 | Anthony M. Mitchell vs. 24-hour Fitness USA, Inc. [CT-003323-13] | Deposition | Circuit Court, 13th Dist., Memphis, TN (TN) |
| 3/24/15 | Mary Estep vs. Wal Mart Stores East, Inc. [13-CI-00088] | Deposition | Clay Co. Circuit Ct, 41st Dist, Manchester, KY (KY) |
| 2/26/15 | Estate of Michael P. West v. Williamson Memorial Hospital [14-C-11] | Deposition | Circuit Court of Mingo Co., WV, Williamson, WV (WV) |
| 2/9/15 | Gary Edward Williamson v. United States of America [5:12-CV-334-JMH] | Deposition | US District Court Eastern District KY Lexington KY (KY) |
| 2/6/15 | Lilia Morote et al vs. Dowdy Denise Almond [CT-001774-12] | Evidentiary Deposition | Circuit Court Shelby County Div VI Memphis, TN (TN) |
| 2/6/15 | Lilia Morote et al vs. Dowdy Denise Almond [CT-001774-12] | Deposition | Circuit Court Shelby County Div VI Memphis, TN (TN) |
| 2/3/15 | Gerry L. Jackson, et. al v. Thomas M. Ballard, et al [13-CI-00282] | Deposition | Nelson Circuit Court, Div II, Bardstown, KY (KY) |
| 1/20/15 | Lora Nelson vs. Stacy Nelson [13-CI-00719] | Court | Oldham Co. (KY) Circuit Court Div. 2, LaGrange, KY (KY) |
| 1/15/15 | Meagan & Rex Ference vs. Geraldine Poulter and Ky Farm Bureau Insurance [13-CI-00286] | Court | Shelby Co. (KY) Circuit Court, Shelbyville, KY (KY) |

| Date | Case Name | Testimony Type | Court |
|---|---|---|---|
| 12/15/14 | Crystal Lee Mosley, et al., vs. Dixie Fuel Co., et. al. [11-CI-00349] | Deposition | Harlan Circuit Court, Harlan, KY (KY) |
| 12/10/14 | Kathleen P. Harriger vs. Daniel F. Harriger [2014-CV-604, 2014-CV-608] | Court | Sumner Co. Circuit Court, Gallatin, TN (TN) |
| 12/2/14 | Dianna Fitts vs. Zeldyne [11C-1423] | Court | Davidson Co. Circuit Court, Div. 6, Nashville, TN (TN) |
| 12/1/14 | Meagan & Rex Ference vs. Geraldine Poulter and Ky Farm Bureau Insurance [13-CI-00286] | Deposition | Shelby Co. (KY) Circuit Court, Shelbyville, KY (KY) |
| 11/19/14 | Tristan Hamilton by Brittney Hamilton v. TJ Samson Hospital & Kelly Dirig, MD [11-CI-00645] | Court | Barren Circuit Court, Glasgow, KY (KY) |
| 10/17/14 | Linda Wells et al v Sun Belt Rentals et al [3:13-cv-0194] | Deposition | U.S. Dist. Court, Middle Dist. Of TN,Nashville, TN (TN) |
| 9/24/14 | Harold Gorman III, Bridgefield Casualty vs. Bridgetstone/Broderson vs. Millco/John Doe Corp [63214] | Deposition | Rutherford Co. (TN) Circuit Court, Murfreesboro, TN (KY) |
| 9/17/14 | Kelly & Woodrow Barker v. Dollar General & Tony Smith [10-CI-00078] | Evidentiary Deposition | Breathitt Co. (KY) Circuit Court, Jackson, KY (KY) |
| 9/10/14 | Rajymond Villarreal. Jr v. Joseph E. Lumbrix and Gary A. Johnson Trucking [13-CI-004216] | Deposition | Jefferson Co. (KY) Circuit Court, Div. 11 (KY) |
| 9/9/14 | Michael Shoaf vs. Cathy W. Combs [11-CI-00473] | Court | Perry Co. Circuit Court, Hazard, KY (KY) |
| 8/1/14 | Dianna Fitts vs. Zeldyne [11C-1423] | Deposition | Davidson Co. Circuit Court, Div. 6, Nashville,TN (TN) |
| 7/29/14 | David & Mary Kozlak vs Terry T. Martin, Dent Shop, Cory & Maurice Cash, Michael's Motor Co. [2010-277] | Deposition | Williamson Co. Circuit Court, Franklin, TN (TN) |
| 7/28/14 | Mike A. Huot v. Gannett Co., Inc. et. al. [12-CI-03578] | Court | Jefferson Co. (KY) Circuit, Div. 13, Louisville, K (KY) |
| 6/27/14 | Tristan Hamilton by Brittney Hamilton v. TJ Samson Hospital & Kelly Dirig, MD [11-CI-00645] | Deposition | Barren Circuit Court, Glasgow, KY (KY) |
| 6/9/14 | Caleb Knipp (Angela Knipp) vs. Ashland Hospital Corporation [11-CI-01127] | Deposition | Boyd Co. (KY) Circuit Court, Ashland, KY (KY) |
| 4/23/14 | Cherri Schnautz Mullins vs. Alan P. Mullins [09-CI-500709] | Court | Jefferson Co (KY) Family Court, Louisville, KY (KY) |
| 3/28/14 | Estate of Riley McCaslin & Amanda McCaslin vs. Tom Rousseau, MD, Advanta Women's Care et al [10-CI-00175] | Deposition | Crittenden Co. (KY) Circuit Court (KY) |
| 3/24/14 | William Roberts et al v. Frankfort Regional Medical Center et al. [12-CI-0052] | Deposition | Franklin Circuit Court Division 1 (KY) |
| 2/17/14 | James & Melissa Reynolds vs. Louisville OB/GYN & Stephen Lebder, MD [04-CI-07113] | Deposition | Jefferson Circuit Court, Div. 8, Louisville, KY (KY) |
| 1/29/14 | Freher vs. Freher [502011DR011614XXXXSB] | Evidentiary Deposition | Circuit Court, Palm Beach Co, FL, 15th Circuit (KY) |
| 1/17/14 | Estate of William S. Dezarn vs. Norton Healthcare, Et. Al. [11-CI-05222] | Deposition | Jefferson Circuit Court, Div. 3, Louisville, KY (KY) |
| 12/11/13 | Roben L. Carter v. United States of America [3:11-0930] | Court | U.S. District Court, Middle District (TN) |
| 11/25/13 | Michael McConnell v Dr. Leigh Walsh & Advocates for Women's Health [08-CI-013426] | Deposition | Jefferson Circuit Div. 13, Louisville, KY (KY) |

| Date | Case Name | Testimony Type | Court |
|---|---|---|---|
| 1/20/13 | Charles & Chrissie Miller and Underwriters Safety and Claims vs. Hunter Engineering Co. [3:12CV-518] | Deposition | U.S. Dist. Court Western Dist. of KY, Louisville (KY) |
| 11/16/13 | Carlos & Barbara Barragan vs. Newkirk MD and Baptist Healthcare [12-CI-00189] | Court | Jefferson Co. (KY) Circuit Court, Div. 4, Lou, KY (KY) |
| 10/30/13 | Grant and Amanda Howard vs. Walmart Stores East LLP [5:12CV-111-R] | Court | US District Court, Western Dist of KY, Paducah (KY) |
| 10/22/13 | Elvira Leyva vs. State of Tennessee [T20120823] | Court | Claims Commission State of TN, Middle Grand Div. (TN) |
| 10/4/13 | Michael Shoaf vs. Cathy W. Combs [11-CI-00473] | Deposition | Perry Co. Circuit Court, Hazard, KY (KY) |
| 9/26/13 | Elvira Leyva vs. State of Tennessee [T20120823] | Deposition | Claims Commission State of TN, Middle Grand Div. (TN) |
| 9/9/13 | Carlos & Barbara Barragan vs. Newkirk MD and Baptist Healthcare [12-CI-00189] | Deposition | Jefferson Co. (KY) Circuit Court, Div. 4, Lou, KY (KY) |
| 9/5/13 | Carrie Andersen v. Tonya Haley, Sumner County, TN and Sumner County Board of Education [2011-CV-8887] | Deposition | Circuit Court, Sumner Co., TN, Gallatin, TN (TN) |
| 8/19/13 | Domeck, Admn. Of Estate of John Grady Husband v. University Surgical Assoc., et. Al. [08-CI-05351] | Court | Jefferson Circuit Court (KY) |
| 8/12/13 | Colleen McCarthy et al vs. Norton Common Legacy Residents, LLC, et al [09-CI-12303] | Deposition | Jefferson Circuit Court Div. 12, Louisville, KY (KY) |
| 7/26/13 | Pamela Conte-Delisi & Benchmark Ins. vs. City of Memphis & Marhta Jane Peeples Avery [CT-004942-08] | Deposition | Circuit Court, 30th District, Shelby Co. TN (TN) |
| 7/22/13 | Patrick Simmons s. Air Ride, Inc. & William A. Reynolds [10-CI-00232] | Deposition | Rockcastle Co (KY) Circuit Court, Mt. Vernon, KY (KY) |
| 7/9/13 | Julie Yarosh et. al. vs. Slavisnski and Eagle Transport Corp [OD11-284] | Court | Montgomery County (TN) Circuit Court (TN) |
| 5/30/13 | Julie Yarosh et. al. vs. Slavisnski and Eagle Transport Corp [OD11-284] | Deposition | Montgomery County (TN) Circuit Court (TN) |
| 5/23/13 | Jessica S. Sanders v. Los Reyes, MD, Moss, CRNA, Anesthesia & Pain Specialists et al [12-CI-00104] | Deposition | Warren County KY Circuit Court, Bowling Green, KY (KY) |
| 5/20/13 | Peyton Starks vs. Loretta Bradford [83CC1-2001-CV-1105] | Arbitration | Sumner County TN Circuit Court, Gallatin, TN (TN) |
| 5/10/13 | Glen Richards vs. Rita Collard and Kentucky Farm Bureau Insurance [10-CI-00547] | Deposition | Jefferson Co. Circuit Court Div. 3, Louisville, KY (KY) |
| 1/21/13 | Joseph & Nancy Scoggins v. Air Evac EMS, Inc., Kim Bowen & Mike Siggers [09-CI-00342] | Deposition | Simpson County (KY) Circuit Court (KY) |
| 1/26/12 | John R. Wyatt vs. Rager & Sons, Inc. and Dorris R. Price [11-CI-00544] | Deposition | Logan Co. (KY) Circuit Court, Auburn, KY (KY) |
| 11/20/12 | Estate of Margaret Dennison vs. EPG, Hobelmann, et al [09-CI-01730] | Deposition | Daviess Circuit Court, Owensboro, KY (KY) |
| 1/15/12 | Thomas Lambe vs. Jude Lambe [11-CI-503339] | Court | Jefferson (KY) Circuit Court, 9th Div, Louisville (KY) |
| 9/14/12 | Jola C. Rutherford v. DJO LLC, et al. [2010CV8790] | Deposition | District Court, Denver County (KY) |

Case 2:15-cv-00185-JRG-MCLC   Document 105-2   Filed 02/18/17   Page 55 of 68   PageID #: 1410

| Date | Case Name | Testimony Type | Court |
|------|-----------|----------------|-------|
| 9/4/12 | William G. Watson vs. Ohio Valley Bistro, Inc. et al [09-CI-1400] | Deposition | McCracken Circuit Court, Div II, Paducah, KY (KY) |
| 8/31/12 | Cheryl Butcher vs. Mahender Pampati, MD, and Hazard Radiology Associates, Inc. [10-CI-00032] | Deposition | Magoffin Circuit Court, Salyersville, KY (KY) |
| 8/21/12 | Chester Carnes vs. James Transportation, LLC dba Tennessee Valley Towing [5:11-cv-00057-TBR] | Deposition | U.S. District Court, West KY., Paducah, ky K (KY) |
| 7/12/12 | Blaine W. Klingemann vs. Breg, Inc. and LMA North America, Inc. [10-CV-1797-PAB] | Deposition | U.S> District Corut, District of Colorado (KY) |
| 7/9/12 | Ashley Anderson and Scotty Anderson v Greenview Regional Hospital and Wayne Bush M.D. [10-CI-02308] | Deposition | Commonwealth of Kentucky Warren Circuit Court (KY) |
| 6/28/12 | Holden Flener v. Nyrstar Clarksville, Inc. [3:11-1219] | Deposition | U.S. Dist. Court, Middle District of TN (TN) |
| 6/26/12 | John Scott Pullem v. Stephen P. Stiles, et. Al. [09-CI-07202] | Deposition | Jefferson (KY) Circuit Court, Div. 4 (KY) |
| 5/31/12 | Jason Peel vs. Barron Pallets [2010-90010] | Deposition | Commonwealth of Kentucky, Dept. of Workers Claims (KY) |
| 5/16/12 | Paul Burke vs. DJO LLC, et. Al. [09-CV-2209 (JRT-FLN)] | Deposition | U.S. District Court, Minnesota (KY) |
| 5/16/12 | Randall Collins vs. DJO LLC, et. Al. [09-CV-02816 JRT/JJK) | Deposition | U.S. District Court, Minnesota (KY) |
| 5/10/12 | David & Laura Crawford vs. Jesse Wireman & H&R Mechanical Contractors, Inc. [09-CI-09] | Deposition | Garrard Circuit Court (13th Dist), Lancaster, KY (KY) |
| 4/19/12 | Lissa M. Rohlik v. I-Flow, LLC [7:10-cv-00173-FL] | Deposition | US District Court,) Eastern Dist. NC Southern Div. (KY) |
| 3/7/12 | Donna Ellis v. Jon Schatzinger, et al. [09-CI-00517] | Deposition | Oldham (KY) Circuit Court, LaGrange, KY (KY) |
| 2/3/12 | Ashley Ann Turner vs. David Arnold Turner [09-CI-00118] | Court | Christian County (KY) Circuit Court, 3rd Circuit (KY) |
| 1/31/12 | Jeremy J. Bird vs. I Flow [3:10-CV-01512AA] | Deposition | U.S. District Court Oregon, Eugene Division (KY) |
| 1/16/12 | Raymond O.and Terri Shannon vs. Brenda B. Sturgeon [4:11-CV-00198-HLM] | Deposition | U.S> District Court, Northern Dist of GA, Rome, GA (TN) |
| 1/10/12 | Lana Kinslow vs. Amedisys [2011-CV-15] | Deposition | Circuit Court Smith County TN (TN) |

Curriculum Vitae

**Ronald Missun, Ph.D.**

**BUSINESS ADDRESS**

Vocational Economics, Inc.
220 W. Main Street
Suite 2150
Louisville, KY 40202
Phone: (502) 589-0995
FAX: (502) 589-2750

**Date of Birth:** ███████████

**Education:**

| | |
|---|---|
| 5/92 to 12/96 | University of Illinois |
| | Ph.D.: Economics |
| | Major: Labor Economics |
| | Minor: Industrial Organization and Law and Economics |
| | |
| 8/90 to 5/92 | University of Illinois |
| | M.S.: Economics |
| | |
| 8/85 to 12/89 | University of Wisconsin - Milwaukee |
| | B.A.: Economics and Mathematics |
| | Major: Specialization in Statistics |

**Work Experience:**

6/98 to Present     Vocational Economics, Inc.
Senior Labor Economist
- Conduct economic assessments
- Serve as a resource for company consultants regarding economic issues
- Provide research assistance in economic issues

8/96 to 5/98     Visiting Assistant Professor, Illinois Wesleyan University, Department of Economics, Bloomington, Illinois.
- Taught principles of economics, industrial organization, and a computer integrated course on business statistics.
- Student advising

8/90 to 5/96     Teaching Assistant, University of Illinois,

Department of Economics, Champaign, Illinois.
- Taught principles of economics and several undergraduate courses in the area of statistics.

## PUBLICATIONS AND PRESENTATIONS:

Missun, Ronald E. and Jacquelyn Vega Velez. "Measuring Earning Capacity Loss." Georgia Continuing Legal Education Presentation, Savannah Marriott Riverfront, Savannah, GA, November 1, 2013.

Missun, Ronald E. and Linda L. Jones. "Measuring Earning Capacity Loss." Kentucky Continuing Legal Education Presentation, East Kentucky Expo Center, Pikeville, KY, November 9, 2012.

Missun, Ronald E. and Sara A. Ford. "Measuring Earning Capacity Loss." Indiana Continuing Legal Education Presentation, Hilton Garden Inn Indianapolis Downtown, Indianapolis, IN, November 2, 2012.

Missun, Ronald E. and Sara A. Ford. "Measuring Earning Capacity Loss." Ohio Continuing Legal Education Presentation, Hilton Cincinnati Netherland Plaza, Cincinnati, OH, October 19, 2012.

Missun, Ronald E. and Sara A. Ford. "Measuring Earning Capacity Loss." Kentucky Continuing Legal Education Presentation, Galt House Hotel & Convention Center, Louisville, KY, March 16, 2012.

Missun, Ronald E., et. al. "Earning Capacity and Vocational Economics – A Response." *Forensic Rehabilitation and Economics,* 3(1), (2010): 5-8.

Gamboa, Anthony M Jr., et al. "A Vocational Economic Rationale." *Estimating Earning Capacity: A Journal of Debate and Discussion* 2, no. 2 (2009): 97-123.

Missun, Ronald E. "Disability, Employment, and Worklife Expectancy: Current Population Survey." Presentation given at the meeting for forensic experts (sponsored by Vocational Econometrics, Inc.), *Disability and Worklife Expectancy from Two Perspectives: The New Worklife Expectancy Tables 2006 Edition,* Las Vegas, NV, April 1, 2006.

Missun, Ronald E. "Typical Challenge Issues." Presentation given at the meeting for forensic experts (sponsored by Vocational Econometrics, Inc.), *Disability and Worklife Expectancy from Two Perspectives: The New Worklife Expectancy Tables 2006 Edition,* Las Vegas, NV, April 1, 2006.

Berlá, Edward P., Ronald E. Missun, and David S. Gibson. "Critiquing the Vocational Analysis." *Trial* 42, no. 2 (February 2006): 52-54.

Missun, Ronald E. "Published Criticisms of The Tables." Presentation given at the meeting for forensic experts (sponsored by Vocational Econometrics, Inc.), *Effective Use of Worklife Expectancies for Persons with a Work Disability*, Louisville, KY, December 12-13, 2003.

Missun, Ronald E. "Identifying Data Sources." Presentation given at the meeting for forensic experts (sponsored by Vocational Econometrics, Inc.), *Effective Use of Worklife Expectancies for Persons with a Work Disability*, Louisville, KY, December 12-13, 2003.

Missun, Ronald E. "Defining Worklife Expectancy." Presentation given at the meeting for forensic experts (sponsored by Vocational Econometrics, Inc.), *Effective Use of Worklife Expectancies for Persons with a Work Disability*, Louisville, KY, December 12-13, 2003.

Missun, Ronald E. "Economic Testimony in Employment Cases." Presentation given at the meeting for attorneys and insurance adjusters (sponsored by Lorman Education Services, Inc.), *Economic Damages in Ohio*, Cincinnati, OH, May 8, 2003.

Missun, Ronald E. "Direct and Cross Examination of Vocational/Economic Experts." Presentation given at the meeting for attorneys (sponsored by Lorman Education Services, Inc.), *Expert Witness Procedures in Kentucky*, Louisville, KY, April 11, 2003.

Missun, Ronald E. "The Trial of a Catastrophic Injury Case." Presented given at the meeting of the Indiana Continuing Legal Education Forum, Indianapolis, IN, November 8, 2002.

Missun, Ronald E. "Vocational and Economic Issues in Traumatic Brain Injury Cases." Presentation given at the meeting sponsored by Charles N. Simkins, *Current Trends in Traumatic Brain Injury*, Detroit, MI, September 27, 2002.

Missun, Ronald E. "An Economist's Perspective on Disabled Worklife Expectancies." Presentation given at the meeting for forensic experts (sponsored by Vocational Econometrics, Inc.), *The New Worklife Expectancy Tables: 2002 Edition; Understanding and Application*, Louisville, KY, July 24-25, 2002.

Gibson, David S., and Ronald E. Missun. "Support and Challenges." Presentation given at the meeting for forensic experts (sponsored by Vocational Econometrics, Inc.), *The New Worklife Expectancy Tables: 2002 Edition; Understanding and Application*, Louisville, KY, July 24-25, 2002.

Tierney, John P., and Ronald E. Missun. "Defining Earning Capacity: The Process." Presentation given at the meeting for forensic experts (sponsored by Vocational Econometrics, Inc.), *The New Worklife Expectancy Tables: 2002 Edition; Understanding and Application*, Louisville, KY, July 24-25, 2002.

Tierney, John P., and Ronald E. Missun. "Defining Earning Capacity: A Process Paradigm." *Journal of Forensic Vocational Analysis* 4, no. 1 (2001): 3-11. (actually published July 2002).

Missun, Ronald E. "Economic Testimony in Employment Cases." Presentation given at the meeting for attorneys and insurance adjusters (sponsored by Lorman Education Services, Inc.), *Economic Damages in Ohio*, Cincinnati, OH, May 14, 2002.

Missun, Ronald E. "Issues of Worklife Expectancy, Methodologies of Developing Useable Data and the US Bureau of the Census." Panel member and presentation given at the meeting of the American Rehabilitation Economics Association, Reno, NV, May 19, 2001.

Missun, Ronald E. "Appropriate Use of a Labor Economist in Personal Injury Cases." Presentation given at the meeting of the Ohio Academy of Trial Lawyers, Cleveland, OH, May 2001.

Missun, Ronald E. "Other Methods, Data Sources, and Studies." Presentation given at the meeting for forensic experts (sponsored by Vocational Econometrics, Inc.), *Understanding Worklife Expectancies*, Louisville, KY, December 12, 2000.

Missun, Ronald E. "Effective Direct and Cross Examination of an Economist in Personal Injury Cases." Presentation given at the meeting of the Cincinnati Bar Association, Cincinnati, OH, September 21, 2000.

Missun, Ronald E. "Impact of ADA on Employment by Disabled Persons: The Gap Continues To Grow." Presentation given at the meeting of the Indiana Continuing Legal Education Forum, Indianapolis, IN, August 2000.

Gamboa, Anthony M., Jr., David S. Gibson, Gwendolyn H. Holland, Ronald E. Missun, Paul Prachyl, Darryl Rowe, John P. Tierney, and Mary Watson. *VALE 2000 User's Manual*. Louisville, KY: Vocational Econometrics, Inc., 1999.

Missun, Ronald E., and Catherine Ingebrigtsen. "Proving Damages Through a Life Care Plan Specialist and Economist." Presentation given at the meeting of the Ohio Academy of Trial Lawyers, *Medical Negligence Seminar*, Columbus, OH, November 19, 1999.

Missun, Ronald E., and Susan Smith. "Proving Damages Through a Life Care Plan Specialist and Economist." Presentation given at the meeting of the Ohio Academy of Trial Lawyers, *Medical Negligence Seminar*, Independence, OH, November 12, 1999

Berlá, Edward P., and Ronald E. Missun. "Calculating the Loss of Earning Capacity of Children: Disability and Death." *Ohio Lawyers Weekly*, August 16, 1999.

Gamboa, Anthony M., Jr., and Ronald E. Missun. "Important Considerations When Computing the Present Value of Lost Earning Capacity." *ATLA tbi* 6, no. 6 (Spring 1999).

Missun, Ronald E. "Occupational Disabilities and Worklife Expectancy." Presentation given at the meeting of the Indiana Continuing Legal Education Forum, *Update on the ADA*, Indianapolis, IN, May 21, 1999.

Missun, Ronald E. "Direct Examination of the Forgotten Expert: The Economist." Presentation given at the annual meeting of the Ohio Academy of Trial Lawyers, Cleveland, OH, April 29, 1999.

Holland, Gwendolyn H., Ronald E. Missun, and Paul Prachyl. "Assessing Earnings Loss When a Client has Returned to Work." *FELA Reporter and Railroad Liability Monitor* 12, no. 2 (1999): 3-4.

Missun, Ronald E. "Present Value of Future Lost Earnings." Presentation given at the meeting for forensic experts (sponsored by Vocational Economics, Inc.), *Defining Monetary Damages*, Louisville, KY, August 1, 1998.

Missun, Ronald E. "The Influence of Early Human Capital Acquisition on Future Educational Attainment." Presentation given at the meeting of the Midwest Economics Association, Chicago, IL, March 17, 1998.

Missun, Ronald E. "The Returns to Basic Skills for Young Adults in the United States." PhD diss., University of Illinois at Urbana - Champaign, January 1997.


**AWARDS AND HONORS:**

Honorable Mention, Robert T. Demarest Departmental Award for Teaching Excellence, University of Illinois, 1994.

Chosen for List of Instructors Rated Excellent by Their Students, University of Illinois: Spring 1992, Fall 1992, Spring 1993, Fall 1993, Spring 1994, and Fall 1994.

Revised: May 2016

# Testimony Report: Ronald E. Missun

8/2/2012 through 8/1/2016

| Date | Case Name | Testimony Type | Court |
|---|---|---|---|
| 7/28/16 | Zachary Wilson, v. Wintrow Construction Corp., et al. [1:13-cv-00631] | Deposition | U.S. District Court, Southern Dist, Western Div (OH) |
| 7/27/16 | Jenger Chambers, a minor, v. Michael A. Ingram, M.D., et al. [13-001156-CA] | Evidentiary Deposition | Bay County Circuit Court (FL) |
| 7/21/16 | Estate of David Covarrubias, et al. v. Covidien LP, et al. [2013-CI-04587] | Deposition | Bexar District Court (TX) |
| 6/23/16 | Marylee Ramazio, et al. vs. Ricardo Fuenmayor, et al. [13-032170-CA-34] | Evidentiary Deposition | Miami-Dade County Circuit Court (FL) |
| 6/21/16 | Drew Evans vs. Central of Georgia Railroad Company [CV-2012-900241] | Evidentiary Deposition | Talladega County Circuit Court (AL) |
| 6/9/16 | William Burns and Karen Burns against 1 Bryant Park LLC, et al. [305430/08] | Court | Bronx County Supreme Court (NY) |
| 6/6/16 | Jason O. Dabney v. Nathan D. Salazar [2012CV2557-1] | Deposition | Newton County Superior Court (GA) |
| 4/26/16 | Russell Fountain & Shawna Fountain v. Deshon O. Grady, O'Neal Timber, Inc & Brierfield Insurance Co [2:14-cv-2878] | Deposition | U.S. District Court, Eastern District of Louisiana (LA) |
| 4/21/16 | Alexander Tirpack v 125 North 10, LLC, Cooper Square Realty, Jason Fixler & Stacy Lager Fixler [13824/12] | Court | Supreme Court of The State of New York, Kings Co. (NY) |
| 4/19/16 | Jeff Clade vs. Hunt Construction Group, Inc. [49D06-0902-CT-07192] | Deposition | Marion County Superior Court (IN) |
| 3/17/16 | Hannah Robinson, et al. vs. Brandon Joseph Jarreau, et al. [624186] | Deposition | East Baton Rouge District Court (LA) |
| 3/11/16 | Marcus Hanner, a minor, et al. v. Kimberly D. Fields, M.D., et al. [CV 11-900135 TFY] | Court | Chambers County Circuit Court (AL) |
| 3/4/16 | Ronald Gorman vs. New York City Department of Transportation and Conti of New York, LLC [28736/11] | Court | Richmond County Supreme Court (NY) |
| 1/28/16 | Consuela L. Siemer vs. Seldomridge Body Shop, Inc., et al. [16-2103-CA-007249] | Court | Duval Circuit Court (FL) |
| 1/5/16 | Estate of Elizabeth Bradley vs. Bryan Kroskol, D.O., et al. [2011 L 35] | Deposition | Dekalb County Circuit Court (IL) |
| 12/7/15 | Estate of George Rivera against Douglas Woodward Jones, M.D., et al. [15 Civ No. 1453 (GHW)] | Deposition | U.S. Dist. Court, Southern District (NY) |
| 10/29/15 | Courtney Green v. Polyester Fibers, LLC [1:13CV234-SA-DAS] | Court | U.S. Dist. Court, Northern Dist., Aberdeen Div. (MS) |
| 10/22/15 | Sean Dowdell against 4545 Eastcoast LLC, et al. [150356/12] | Court | New York County Supreme Court (NY) |
| 10/1/15 | Estate of William H. Stranahan, II, et al. v. Dennis D. Botelho, M.D., et al. [KC 10-1304] | Court | Kent Superior Court (RI) |
| 9/16/15 | Estate of Mitch Arthur v. MacAllister Machinery Co., et al. [42C01-1301-CT-005] | Deposition | Knox County Circuit Court (IN) |
| 8/27/15 | Estate of Robert A. Crider v. John Doyle, et al. [49D12-1110-PL-040455] | Deposition | Marion Superior Court (IN) |

| Date | Case Name | Testimony Type | Court |
|---|---|---|---|
| 8/13/15 | Bahareh Hashemian vs. Techtronic Industries North America, Inc., et al. [14E000352A] | Deposition | Fulton County State Court (GA) |
| 28/10/15 | Jadarius Lockley, a minor, vs. Edward Reed, M.D., et al. [CV-2014-901458.00] | Deposition | Montgomery County Circuit Court (AL) |
| 7/22/15 | Estate of Bailey Addison Helton vs. U.S.A, et al. [6:14-cv-00122-DCR] | Deposition | U.S. District Court, Eastern District (KY) |
| 7/17/15 | Charles Smith against City of New York, et al. [7020022/2012] | Court | Queens County Supreme Court (NY) |
| 7/7/15 | Michael Melville, et al. against Brooklyn Arena LLC, et al. [25539/11] | Court | Kings County Supreme Court (NY) |
| 6/18/15 | Mark Fabiano, et al against The State of New York, et al. [120443] | Court | New York Court of Claims (NY) |
| 6/15/15 | Gurbhajan Singh vs. Meharry Medical College [3:12-1122] | Deposition | U.S. District Court, Middle District of TN (TN) |
| 6/12/15 | Xavier N. Bouldin vs. William N. Toth [14EV002333J] | Deposition | Fulton County State Court (GA) |
| 6/9/15 | Kellie Anthony, et ux vs. Zurich American Insurance Company, et al [564, 319-A] | Deposition | Caddo Parish District Court (LA) |
| 6/9/15 | Kellie Anthony, et ux vs. Zurich American Insurance Company, et al [564, 319-A] | Deposition | Caddo Parish District Court (LA) |
| 6/9/15 | Kellie Anthony, et ux vs. Zurich American Insurance Company, et al [564, 319-A] | Deposition | Caddo Parish District Court (LA) |
| 6/8/15 | Estate of Edward P. Boulet, et al. vs. The Miriam Hospital, et al. [PC 11-6151] | Deposition | Providence Superior Court (RI) |
| 5/29/15 | Pamela Plowman v. Fort Madison Community Hospital, et al. [LALA006220] | Deposition | Lee County District Court (IA) |
| 5/5/15 | Estate of William H. Stranahan, II, et al. v. Dennis D. Botelho, M.D., et al. [KC 10-1304] | Court | Kent Superior Court (RI) |
| 4/29/15 | Wesley Kennedy vs. New York City School Construction Authority, et al. [150-497/2013] | Court | Richmond County Supreme Court (NY) |
| 4/28/15 | Javier Gonzalez vs. New York City Transit Authority, et al. [306131/12] | Court | Bronx County Supreme Court (NY) |
| 4/23/15 | Michael Wells vs. Eastern Sheet Metal, Inc. [A 1304780] | Deposition | Hamilton County Court of Common Pleas (OH) |
| 4/22/15 | Julianna Gwin, a minor vs. J. Michael Knapp, D.O., et al. [07-C-14-000433] | Deposition | Cecil County Circuit Court (MD) |
| 4/20/15 | Carol Sparks Drake vs. Thomas A. Dickey, et al. [29D04-0908-CT-002767] | Deposition | Hamilton County Superior Court (IN) |
| 4/14/15 | Estate of Charles Crenshaw v. Srinivas Bhadriraju, MD, et al. [14A50668-7] | Court | Dekalb County State Court (GA) |
| 4/8/15 | Winfred Evans vs. Norfolk Southern Railway Company, et al. [2012CV223527] | Court | Fulton County Superior Court (GA) |
| 3/27/15 | Joseph M. Osinski v. Permafloor, L.L.C., et al. [BUR-L-1594-13] | Evidentiary Deposition | Burlington County Superior Court (NJ) |
| 3/18/15 | Estate of Rosendo Betancourt v. Miami-Dade County, et al. [13-22614-CIV-GRAHAM/McAliley] | Deposition | U.S. District Court, South District (FL) |
| 2/20/15 | Mychal M. Fair, deceased v. CIV Underground, LLC, et al. [13EV018743G] | Deposition | Fulton County State Court (GA) |

Case 2:15-cv-00185-JRG-MCLC   Document 105-2   Filed 02/18/17   Page 63 of 68   PageID #: 1418

| Date | Case Name | Testimony Type | Court |
|---|---|---|---|
| 2/11/15 | Alexandre Barbosa v. F&S Contracting, LLC, et al. [23582/11] | Court | Kings County Supreme Court (NY) |
| 2/9/15 | Winfred Evans v. Norfolk Southern Railway Company and Professional Transportation, Inc. [2012CV223527] | Deposition | Fulton County Superior Court (GA) |
| 1/28/15 | Gary Utterback, et al. v. American Family Mutual Insurance Company, et al. [14-CV-00119] | Deposition | Walworth County Circuit Court (WI) |
| 1/21/15 | Manuel Sanango vs. Michael Partridge Realty Corp. [4533/12] | Court | Queens County Supreme Court (NY) |
| 1/9/15 | Ashton Haywood, a minor vs. Tracy Burton, M.D., et al. [50-2012CA007494XXXMB AI] | Deposition | Palm Beach County Circuit Court (FL) |
| 12/19/14 | Ayman Al-Hendy, M.D., Ph.D. v. Meharry Medical College [3:11-cv-1201] | Court | U.S. District Court, Middle District (TN) |
| 1/13/14 | Gary Wessel and Roseann Wessel vs. Syeda T. Hossain, et al. [18994/10] | Court | Nassau County Supreme Court (NY) |
| 11/5/14 | Estate of Aileen McKay-Dalton, et al. vs. United States of America [CV-12-506] | Deposition | U.S. District Court, Eastern District (NY) |
| 10/27/14 | Estate of David Boudreau vs. Michael Shapiro, M.D., et al. [25024/07] | Court | Supreme Court of Queens County (NY) |
| 10/3/14 | Christopher Hennessy vs. Continuum Health Partners, Inc., et al. [107580/09] | Court | Supreme Court of New York County (NY) |
| 9/4/14 | Sahara Howard, a minor vs. Betsy Brown, CNM, et al. [2013A1537-6] | Deposition | State Court of Cobb County (GA) |
| 8/27/14 | Mark Durrah vs. Central of Georgia Railroad Company [10CV-480P] | Court | Sumter County Superior Court (GA) |
| 8/14/14 | Mark Durrah vs. Central of Georgia Railroad Company [10CV-480P] | Deposition | Sumter County Superior Court (GA) |
| 7/10/14 | Estate of Michelle Cintron vs. Rachel Waldron, M.D., et al. | Court | Supreme Court of Queens County (NY) |
| 7/8/14 | Tiffany M. Amell vs. Verizon New Jersey, et al. [GLO-L-195-12] | Evidentiary Deposition | Superior Court of Gloucester County (NJ) |
| 6/23/14 | Noe Escamilla v. Shiel Sexton Company, Inc. [54D01-1107-CT-000562] | Deposition | Montgomery Superior Court (IN) |
| 6/16/14 | Estate of David J. Philhower vs. University Hospital, Inc., et al. [A1201302] | Deposition | Hamilton County Court of Common Pleas (OH) |
| 5/27/14 | Gilbert Hernandez vs. Consolidated Edison Company of New York, Inc., et al. [301327/09] | Court | Supreme Court of Bronx County (NY) |
| 5/19/14 | Estate of William H. Stranahan, II, et al. vs. Dennis D. Botelho, M.D., et al. [KC 10-1304] | Deposition | Kent Superior Court (RI) |
| 5/9/14 | Tonya A. Lucas, et al. v. Brian D. Conrad and Austin A. Conrad [48C01-1201-CT-000007] | Deposition | Madison Circuit Court, Division I (IN) |
| 5/8/14 | Michael Shoaf vs. Cathy W. Combs [11-CI-00473] | Evidentiary Deposition | Perry Circuit Court (KY) |
| 4/10/14 | Bernard Verdon and Mary Verdon against Port Authority of New York and New Jersey, et al [309654/09] | Court | Supreme Court of Bronx County (NY) |
| 3/25/14 | Jose David Garcia vs. 163-170 East 81st Street Associates, L.P., et al. [301166/2008] | Court | Supreme Court of Bronx County (NY) |
| 3/24/14 | Arlis R. Judkins vs. Lawrence D. Carroll, et al. [11-L-7] | Deposition | Circuit Court of Clark County (IL) |

Case 2:15-cv-00185-JRG-MCLC Document 105-2 Filed 02/18/17 Page 64 of 68 PageID #: 1419

| Date | Case Name | Testimony Type | Court |
|---|---|---|---|
| 3/17/14 | Estate of Glenn Zeigler, Deceased vs. Jude J. Momodu, MD, et al. [54D02-1111-CT-00972] | Court | Montgomery Superior Court No. 2 (IN) |
| 3/12/14 | Patrick Naughton, Jr. vs. The City of New York, et al. [104026/05] | Court | New York County Supreme Court (NY) |
| 3/10/14 | Lorren Seamans v. Injured Patient and Families Compensation Fund, et al. [13-CV-43] | Deposition | Lincoln County Circuit Court (WI) |
| 3/6/14 | Nancy Miller v. Lewis Townsend, M.D. [336958V] | Deposition | Montgomery County Circuit Court (MD) |
| 2/18/14 | Estate of Rene Hernandez vs. World International Security, Inc., et al. [12-34289 CA 23] | Evidentiary Deposition | Miami-Dade County Circuit Court, 11th Circuit (FL) |
| 2/7/14 | Estate of Thomas Fraumane, Deceased vs. Martin Phillip Kasofsky, M.D., et al. [0620-09] | Court | Supreme Court of Montgomery County (NY) |
| 1/30/14 | Michael Gambale and George Cintron vs. 400 Fifth Realty LLC, et al. [18694/09] | Court | Supreme Court of Kings County (NY) |
| 1/21/14 | Sean Segota v. Tishman Construction Corporation of New York, et al. [108049/10] | Court | Supreme Court of New York County (NY) |
| 1/16/14 | Abigail Huynh, a minor v. Sabrina O. Falkner, M.D., et al. [10C-14341-5] | Court | State Court of Gwinnett County (GA) |
| 1/14/14 | William M. Carter vs. General Electric Company [3:10CV-306-R] | Deposition | U.S. District Court, Louisville Division (KY) |
| 1/10/14 | Linda Esterman, et al. vs. Speedway, LLC, et al. [A1300854] | Deposition | Hamilton County Court of Common Pleas (OH) |
| 12/17/13 | Sara B. Free and Alexander T. Ellerbee vs. Good Earth Termite & Pest Control, Inc. [CT-003652-12] | Court | Circuit Court of Shelby County, Division VI (TN) |
| 12/11/13 | Roben L. Carter v. United States of America [3:11-0930] | Court | U.S. District Court, Middle District (TN) |
| 12/2/13 | Kaleb Avalos-Landeros, a Minor, et al., v. United States of America, et al. [11-cv-02204] | Deposition | U.S. District Court, Northern Dist., Eastern Div. (IL) |
| 11/20/13 | Nola C. Henry v. Wilkerson Transport, Inc. [11-CI-01670] | Deposition | Hardin Circuit Court, Division 3 (KY) |
| 11/13/13 | Sara B. Free and Alexander T. Ellerbee vs. Good Earth Termite & Pest Control, Inc. [CT-003652-12] | Deposition | Circuit Court of Shelby County (TN) |
| 11/5/13 | Elexia Ingram, a Minor v. St. Bernard Hospital, et al. [07 L 004375] | Deposition | Circuit Court of Cook County (IL) |
| 10/23/13 | Michael Shoaf vs. Cathy W. Combs [11-CI-00473] | Deposition | Perry Circuit Court (KY) |
| 10/1/13 | Patrick McCusker and Kelley McCusker vs. First Student, Inc., et al. [1222-CC02366] | Court | Circuit Court of the City of St. Louis (MO) |
| 9/19/13 | John P. Miller, et al v. Mercy Hospital Fairfield, et al. [CV2012114035] | Deposition | Court of Common Pleas (OH) |
| 8/28/13 | Steven T. Carney v. Dipti S. Vyas, D.O.; et al. [49D11-0402-CT-0290] | Court | Marion Superior Court (IN) |
| 8/15/13 | Peter J. Francis vs. A&R Transport, Inc. and Dennis E. Desautels [CV11-0132] | Deposition | U.S. District Court, Eastern District (NY) |
| 7/26/13 | Edward Perez-Mossetty, et al. vs. American Tugs, Incorporated, et al. [10 L 001204] | Deposition | Circuit Court of Madison County (IL) |
| 6/25/13 | Frances McKeehan vs. Edwin B. Evans and Edwin B. Evans Auto Care, Inc. [12-CI-00044] | Court | Madison Circuit Court, Division II (KY) |

Case 2:15-cv-00185-JRG-MCLC   Document 105-2   Filed 02/18/17   Page 65 of 68   PageID #: 1420

| Date | Case Name | Testimony Type | Court |
|---|---|---|---|
| 6/21/13 | David Carter v. Indiana Department of Transportation, et al. [49D07-1102-PL-006764] | Deposition | Marion County Superior Court (IN) |
| 6/14/13 | Tyler M. Holliday, a minor, et al., vs. West Chester Family Physicians, Inc., et al. [CV11 10 3647] | Evidentiary Deposition | Court of Common Pleas, Butler County (OH) |
| 6/6/13 | Patrick McCusker and Kelley McCusker vs. First Student, Inc., et al. [1222-CC02366] | Deposition | Circuit Court of City of St. Louis (MO) |
| 6/3/13 | Estate of Zbigniew Korzeniewski v. Wojciech Jarzbek, et al. [08 L 8924] | Deposition | Circuit Court of Cook County (IL) |
| 5/31/13 | Jonaah Violet Super, an infant, against, Dr. David M. De Iulio (NPM), et al. [5031/2004] | Court | Supreme Court Dutchess County (NY) |
| 5/28/13 | Demetria Holmes vs. Georgia Power Co., and John Clower, Jr. [2012CV01696FF] | Deposition | State Court of Clayton County (GA) |
| 4/23/13 | Marcus Hanner, a minor, et al. vs. Kimberly D. Fields, M.D., et al. [CV 11-900135 TFY] | Deposition | Circuit Court of Chambers County (AL) |
| 3/26/13 | Henrique Staveski and Izabel Camargo vs. State of New York [Claim No. 115633] | Court | New York Court of Claims (NY) |
| 3/7/13 | Clint Holliday, et al. vs. West Chester Family Physicians, Inc., et al. [CV11 10 3647] | Deposition | Butler County Court of Common Pleas (OH) |
| 3/6/13 | Edgar Green vs. Thomas J. Campen, M.D., et al. [08-27670 (03)] | Court | Circuit Court in and for Broward County (FL) |
| 2/11/13 | The Estate of Paul Connor Brewer vs. Appalachian Regional Healthcare, Inc., et al. [09-CI-00217] | Deposition | Perry Circuit Court (KY) |
| 2/5/13 | Edgar Green vs. Thomas J. Campen, M.D., et al. [08-27670 (03)] | Deposition | Circuit Court in and for Broward County (FL) |
| 2/1/13 | Leonard C. Harris vs. CSX Transportation, Inc. [10-CI-01041] | Court | Jefferson Circuit Court (KY) |
| 11/30/12 | James Blakely and Kellie Blakely vs. A.M. Castle& Co., et al. [09 L 10306] | Evidentiary Deposition | Circuit Court of Cook County (IL) |
| 1/29/12 | Leonard C. Harris vs. CSX Transportation, Inc. [10CI01041] | Deposition | Jefferson Circuit Court (KY) |
| 9/10/12 | Jola C. Rutherford v. DJO LLC, et al. [2010CV8790] | Deposition | District Court, Denver County (KY) |
| 8/29/12 | James G. Seubert v. FFE Transportation Services, Inc. and William James Beaty [4:11-CV-01651 AGF] | Deposition | U.S. District Court, Eastern District of Missouri (MO) |
| 8/17/12 | William Gerald Watson vs. Ohio Valley Bistros, Inc. et al. [09-CI-1400] | Deposition | McCracken Circuit Court (KY) |
| 8/14/12 | John Matthews, et al. vs. Jonathon B. Lupton, M.D., et al. | Court | Commissioner of Insurance (IN) |
| 7/31/12 | Ryan Smith, a minor, et al. v. The Medical Center of Central Georgia, Inc., et al. [11CV-54643] | Deposition | Superior Court of Bibb County (GA) |
| 7/25/12 | Michaelle Clarke v. Guy D. Roberts, DO, et al. [10JE-CC00510] | Deposition | Circuit Court of Jefferson County (MO) |
| 7/12/12 | Blaine W. Klingemann vs. Breg, Inc., and LMA North America, Inc. [10-CV-1797-PAB] | Deposition | U.S. District Court, District of Colorado (CO) |
| 7/10/12 | Jerry Burton v. Aaron Burkert, et al. [49D07-1007-CT-031363] | Evidentiary Deposition | Marion County Superior Court (IN) |
| 7/10/12 | Jerry Burton v. Aaron Burkert, et al. [49D07-1007-CT-031363] | Deposition | Marion County Superior Court (IN) |

Case 2:15-cv-00185-JRG-MCLC Document 105-2 Filed 02/18/17 Page 66 of 68 PageID #: 1421

| Date | Case Name | Testimony Type | Court |
|---|---|---|---|
| 7/9/12 | Estate of Melinda Barrow vs. Weitz & Luxenberg, et al. [1999 CA1099-9896] | Deposition | Circuit Court of Orange County (FL) |
| 6/26/12 | Crystal Wright against MTA Bus Company and "John Doe" - Driver [505/10] | Court | Supreme Court, County of Queens (NY) |
| 6/19/12 | Estate of Melissa Baker vs. Dermatopathology Laboratory of Central States, et al. [02D01-1005-CT-219] | Evidentiary Deposition | Allen Superior Court (IN) |
| 6/6/12 | Ronna Dalton and John Dalton v. Animas Corporation [3:09-CV-354-H] | Deposition | U.S. District Court, Western District (KY) |
| 6/1/12 | James Blakely and Kellie Blakely vs. A.M. Castle & Co., et al. [09 L 10306] | Deposition | Circuit Court of Cook County (IL) |
| 5/31/12 | Estate of Lori Kathleen Keen v. Nestle Waters North America, Inc. [1:10-CV-1075-LJM-TAB] | Deposition | U.S. District Court, Southern District (IN) |
| 5/25/12 | KB, a minor child vs. Erie County Office of Children & Youth, et al. [03-259E] | Court | U.S. District Court, Western District (PA) |
| 5/18/12 | Randall D. Collins v. DJO Incorporated, et al. [09-cv-02816 (JRT/JJK)] | Deposition | U.S. District Court (MN) |
| 5/18/12 | Paul G. Burke, et al. v. DJO,LLC, et al [0:10-cv-02209-JRT-FLN] | Deposition | U.S. District Court (MN) |
| 5/8/12 | Alanis Yates, a Minor v. Pamela Templeton, M.D. and Community Hospitals of Indiana, Inc. [49D01-1001-CT-000824] | Deposition | Marion County Superior Court (IN) |
| 5/3/12 | Sarah Burch vs. Mercy Hospitals East Communities, et al. [11SL-CC01716] | Deposition | Circuit Court, County of St. Louis (MO) |
| 4/23/12 | Christopher Wolf v. Reinauer Transportation Companies, LLC, et al [10-cv-4424] | Deposition | U.S. District Court, Eastern District (NY) |
| 4/19/12 | Lissa M. Rohlik v. I-Flow, LLC [7:10-cv-00173-FL] | Deposition | US District Court,\ Eastern Dist. NC Southern Div. (KY) |
| 3/29/12 | Abigail Huynh, a minor v. Sabrina O. Falkner, M.D., et al. [10C14341-5] | Deposition | State Court of Gwinnett County (GA) |
| 3/13/12 | Gupreet Gyani, et al., vs. Great Neck Medical Group, et al. [16302/04] | Court | Supreme Court of Nassau County (NY) |
| 2/8/12 | Harvey Burk, et al. vs. Daniel J. Evans, D.O., et al. [08CVA-12-17793] | Deposition | Franklin County Court of Common Pleas (OH) |
| 2/6/12 | Estate of John C. Woolums, Deceased vs. Pantry, Inc. [02D01-0906-CT-247] | Evidentiary Deposition | Allen Superior Court (IN) |
| 2/3/12 | Jeremy J. Bird vs. I-Flow Corporation [3:10-cv-01512-AA] | Evidentiary Deposition | U.S. District Court, Dist. of Oregon, Eugene Div. (OR) |
| 1/30/12 | Jose Pollock v. The Rye City School District, et al. [9988/06] | Court | Supreme Court, County of Westchester (NY) |
| 1/20/12 | Ronald Schinberg vs. Construction Concept Management Corp, Inc., et al. [09 L 9204] | Deposition | Circuit Court of Cook County (IL) |
| 1/12/12 | Daniel W. Rice, III v. Sellersburg Volunteer Fire Department Incorporated, et al [10C01-0908-CT-648] | Deposition | Circuit Court of Clark County (IN) |

<u>Rate of Compensation</u>

Combined Vocational Economic
Assessment of Earning Capacity: $4,000.00

Court and Deposition Time:
Jones: Billed at $400 per hour
Missun: Billed at $580 per hour

Consultation Time:
Jones: Billed at $250 per hour
Missun: Billed at $420 per hour